No. 91,051

STATE OF KANSAS, *Appellee,* v. MICHAEL W. KESSELRING, *Appellant.*

112 P.3d 175

Opinion filed June 3, 2005.

*B. Joyce Yeager*, of Yeager Law Firm, L.L.C., of Overland Park, argued the cause and was on the briefs for appellant.

*Trent M. Krug*, assistant district attorney, argued the cause, and *Trevor D. Riddle*, legal intern, *Charles Branson*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: A jury convicted Michael Kesselring of aggravated kidnapping, conspiracy to commit aggravated kidnapping, and first-degree murder under a combined theory of premeditated murder and felony murder. The trial court sentenced Kesselring to a controlling term of life imprisonment with parole eligibility after 20 years, plus 234 months' imprisonment.

Kesselring appeals his convictions and sentences, arguing: (1) The jury failed to make unanimous findings of guilt on the first-

degree murder charge and the aggravated kidnapping charge; (2) the first-degree murder sentence was erroneous because it was unclear which alternative means was found by the jury; (3) his right to a fair trial was violated by references to polygraph examinations taken by two witnesses; (4) the trial court erred in admitting the hearsay statements of a deceased witness; and (5) the trial court erred in admitting the defendant's mail into evidence. We affirm.

*Facts*

On October 3, 2000, Dale E. Miller reported to the Topeka Police Department that his son, Dale Alan Miller (Miller), was missing and that he had last spoken with his son on September 13, 2000. An investigation began which eventually raised questions about Miller's connection to a drug ring in which his cousin, Michael Reece, was involved. The investigation also discovered information that a large quantity of drugs had been stolen from the drug ring and Miller was accused of taking it.

The drug ring involved several people who testified at trial: Heather Reece, who was Reece's common-law wife; Gary Holmes, who was Heather's father; Curtis Callarman; and Scott Clift. Kesselring was a customer and friend of Reece. Reece did not testify because he died of cancer a few weeks before trial.

When Reece was indicted on federal drug trafficking charges, he came forward with information about Miller's disappearance. In April 2001, Reece led Kansas Bureau of Investigation (KBI) agents to a site where he claimed Miller had been killed and where he said agents might find some evidence, such as a shoe. The agents did recover a shoe and also a T-shirt with two bullet holes in it. Reece then led the agents to a second site where Miller's shirtless body was eventually recovered. Three .22 caliber bullets fired from the same gun were recovered from the body.

In the course of investigating Miller's death, KBI Agent Jeff Hupp interviewed many of the State's witnesses including Clift, Donna Welty, Heather, Holmes, and Callarman. Hupp testified about those interviews at trial, and where applicable, the audio or videotape of each witness' statement was played for the jury.

The only eyewitness to the murder was Holmes, an admitted alcoholic and drug addict who occasionally sold drugs for Reece's organization. Holmes testified that Reece had contacted him and told him drugs were missing from the storage unit. Holmes and Reece went to the storage unit together to investigate, and Reece concluded Miller had stolen the drugs. At Reece's request, Holmes agreed to help get the drugs back.

Holmes testified that Reece picked him up that evening and they went to a motel in Topeka to pick up Kesselring. The three men returned to the Reeces' house and discussed how to get the drugs back from Miller. After Callarman arrived, the four men went outside and Reece got two guns out of a car, giving one of them, a .22, to Kesselring. Reece told Kesselring, "[T]hat's a throw-away gun . . . you can use it." Holmes and Kesselring got into a blue car, which they had borrowed from Clift so that the car would not be traceable to them, and followed Reece and Callarman to the house where Miller was staying.

Callarman testified that when they got to the house, Kesselring and Holmes hid beside the house and behind a bush while he knocked on the door. When Miller answered, according to Callarman, Kesselring and Holmes ran up with their guns and told Miller that Reece wanted to talk to him. As they walked Miller out to Reece's car, Reece told Miller to ride with Kesselring and Holmes. Holmes testified that he could not remember for sure whether he had a gun in his hand but thought he probably did. According to Holmes, Miller got in the front seat of the car Kesselring was driving, and Holmes got in the back seat. Holmes remembered having a Tek 9 gun at that time.

The plan was to meet Reece and Callarman back at the Reeces' house. As Kesselring slowed down for a yield sign, Miller jumped out of the car and ran down the street. Both Holmes and Kesselring jumped out of the car to look for him. Holmes found Miller hiding underneath a car, grabbed him by his T-shirt, and brought him back to the car at gunpoint. Holmes testified Miller was "pretty terrified."

Holmes, who was drunk, passed out in the back seat of the car. The next thing Holmes remembered was waking up because dust

was rolling in the windows of the car, which was out in the country on a dirt road. Kesselring was yelling at Miller about the drugs. Miller was still denying that he had stolen the drugs and was claiming some black men had put the drugs in a different storage unit. Holmes asked, "Where the hell are we?" and Kesselring responded they were going to meet Reece.

Holmes testified that Kesselring pulled up to a bridge and shut off the car, telling Miller to get out. Holmes, who walked around the back of the car, saw Kesselring and Miller in front of the car. Kesselring was telling Miller they wanted the drugs back and that he was going to kill him. Miller pleaded for his life, and then Holmes saw Kesselring shoot Miller several times. Holmes and Kesselring threw Miller's body over the side of the bridge.

A few days later, Holmes and Kesselring returned to the scene and pulled Miller's body underneath the bridge, and a few days after that, they moved the body to an entirely different location, poured a bag of lime over it, and buried it. At first Holmes refused to assist in moving the body, but Reece offered to give him $1,000. Reece asked Holmes not to tell Kesselring about the money because Reece had given Kesselring less than that to kill Miller.

There were some inconsistencies between Holmes' testimony and the version of events he told Agent Hupp. For instance, Holmes told Agent Hupp that he was awake and threatening Miller as Kesselring drove the vehicle onto the gravel road. Holmes also did not initially admit to Agent Hupp that he helped move and bury Miller's body. Holmes told Agent Hupp he might have helped, but he was not totally sure. At trial, Holmes testified he had been drunk during the interview and, as a result, had difficulty remembering certain things. Pursuant to a plea bargain, Holmes pled guilty to reduced charges of attempted kidnapping and conspiracy to commit kidnapping and agreed to cooperate and testify truthfully in any prosecution regarding Miller's murder.

Several witnesses testified they heard Kesselring admit to the shooting. Clift testified he could not remember whether Kesselring or Reece told him about the shooting of Miller. However, in his interview with Agent Hupp, Clift first accused Reece of having murdered Miller. At trial, Clift explained he had lied about Reece

being responsible because he was angry at him, believing Reece was responsible for Clift's federal indictment. Clift eventually told Agent Hupp what he knew about Holmes' and Kesselring's involvement in the murder and stated that Kesselring told him he had shot Miller in the back of the head.

Heather Reece testified she had overheard Kesselring tell Reece that Miller "wouldn't tell me where everything was at so I blew his fucking head off." The next morning, Heather went to see her father, Holmes, who told her Kesselring had shot Miller. Heather also testified that after the murder, Reece bought Kesselring a truck and told Heather to give Kesselring and his mother anything they needed. Heather gave Kesselring free drugs, paid the rent and utilities for Kesselring's mother, and took her shopping. Kesselring's mother, Deloris Walker, contradicted this testimony, stating that Heather never paid any of her bills or ran errands for her.

Callarman, who testified regarding his role in the kidnapping, also testified he heard Kesselring tell Reece that Miller was dead and also heard them discuss how to dispose of the body and evidence. Callarman testified that, while he and Kesselring were both in the Douglas County jail, Kesselring sent him several "kites" or letters asking him to say that Kesselring was not involved in Miller's murder. Two of the letters were introduced into evidence. The State also introduced several other letters and handwriting exemplars from Kesselring in an attempt to demonstrate the letters to Callarman were in fact written by Kesselring. Like Holmes, Callarman was offered a favorable plea agreement. He pled guilty to a single count of conspiracy to commit kidnapping and agreed to cooperate and testify truthfully in the prosecution of Miller's murder. The State agreed to recommend that Callarman's sentence run concurrent with his federal sentence.

In his own defense, Kesselring testified that on the night in question, he was out running an errand for his mother and stopped by the Reeces' house to buy a joint. When he got there he saw Reece, Heather, Callarman, and Holmes coming out of the house. Holmes was getting into a car with a gun. Reece told Kesselring that Miller had stolen $75,000 worth of drugs and they were going to go get him before he left town. Reece asked Kesselring if he wanted to

go along, and Kesselring said no. Kesselring left and returned to his mother's house. He testified he had nothing to do with Miller's murder. Kesselring admitted writing letters to Callarman while in jail, but he argued that he was merely asking Callarman to tell the truth.

### Did the Jury Make Unanimous Findings of Guilt on the First-Degree Murder Charge and the Aggravated Kidnapping Charge?

Kesselring's first argument on appeal is that the jury did not make a unanimous finding of guilt on the first-degree murder charge or the aggravated kidnapping charge. This court exercises de novo review over issues of jury unanimity. *State v. Hoge*, 276 Kan. 801, 813, 80 P.3d 52 (2003).

"To determine whether the jury verdict was unanimous when the defendant is charged with both felony murder and premeditated murder as underlying theories for first-degree murder, the proper test to apply is the alternative means test . . .:

" ' "In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.] In reviewing an alternative means case, the court must determine whether a rational trier of fact *could* have found each means of committing the crime proved beyond a reasonable doubt. [Citations omitted.]" ' " *Hoge*, 276 Kan. 801, Syl. ¶ ¶ 8-9.

### Alternative Means for Murder

Kesselring argues there was insufficient evidence to convict him of first-degree murder under a theory of either premeditation or felony murder. He complains that there was conflicting testimony about who was armed on the night of Miller's murder, about whether Miller came out of the house willingly or was lured out by Callarman, and about whether Holmes was awake and threatening Miller or passed out in the back seat on the way to where Miller was killed. Kesselring also argues that much of the evidence in support of his conviction was inadmissible hearsay and the other witnesses were not credible. In particular, Kesselring notes that Holmes, the only eyewitness, was admittedly intoxicated, offered

inconsistent testimony, and was motivated to downplay his own involvement in the crime.

Kesselring's arguments ignore the applicable standard of review. "In reviewing the sufficiency of the evidence, this court will not reweigh the evidence. It is the jury's function, not ours, to weigh the evidence and determine the credibility of witnesses. [Citation omitted.]" *State v. Doyle*, 272 Kan. 1157, 1162-63, 38 P.3d 650 (2002). "When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003).

In this case, there was sufficient evidence to support a rational jury's belief that the defendant committed first-degree murder under either a theory of premeditation or felony murder. Premeditation is the process of simply thinking about a proposed killing before committing the act. Premeditation may be inferred from the nature of the weapon used, the defendant's conduct before and after the killing, the defendant's statements before and during the killing, and whether there was any provocation. *State v. Meeks*, 277 Kan. 609, 621-22, 88 P.3d 789 (2004).

The State introduced evidence that Kesselring threatened Miller before he was killed and then shot him multiple times, including once in the head. The State also introduced evidence that Michael Reece paid Kesselring to kill Miller because Miller had stolen drugs from Reece's drug ring. A car was obtained which could not be traced to those involved, a "throw-away" gun was used, and other aspects of the crime were planned. Further, there was no evidence that Miller provoked Kesselring. Thus, a reasonable jury could have concluded from this evidence that Kesselring premeditated the murder of Miller.

The evidence was also sufficient under a felony-murder theory. To convict Kesselring of felony murder, the jury had to find that he killed Miller during the commission of aggravated kidnapping, the inherently dangerous felony charged as the underlying crime. See K.S.A. 21-3401(b); K.S.A. 2004 Supp. 21-3436(a)(2). To con-

vict Kesselring of aggravated kidnapping, the jury had to find that he took or confined Miller by force, threat, or deception; that he did so with intent to inflict bodily injury or terrorize Miller; and that bodily harm was inflicted on Miller. See K.S.A. 21-3421.

The State introduced evidence that Kesselring and Holmes were both armed with guns and forced Miller to get into their car, where he was held at gunpoint. The State also introduced evidence that Kesselring threatened Miller and eventually shot and killed him. Based on this evidence, a reasonable jury could have concluded Kesselring killed Miller during the commission of aggravated kidnapping.

### Prosecutor's Argument Regarding Unanimity

Kesselring presents several additional arguments contending that his murder conviction is erroneous because of other defects in the trial which call into question whether the jury reached a unanimous verdict. First, he argues the lack of evidence, when combined with the prosecutor's admonition that only six jurors need agree on a means, requires that his conviction of first-degree murder be reversed.

This argument is based upon a portion of the State's closing argument. In explaining to the jury that Kesselring was charged with a single count of first-degree murder under alternative theories of premeditation and felony murder, the prosecutor stated:

"[I]t doesn't matter if all of you agree on which one, so six of you can say you know what, we think he's guilty of felony murder. We don't think he was premeditated, that he pulled the trigger or that Gary Holmes pulled the trigger on Dale Miller. But we do believe it was committed during the course of the commission of this felony, so we think it's felony murder. The other six can say you know what, he had him right in front of him, told him he was going to kill him and killed him. We think it's premeditated. Six of you can go one way — [the other six] the other way. If you do that, that's fine, that's first-degree murder still so it doesn't matter. It's only if all 12 of you can't agree to one or the other then the defendant's not guilty."

In fact, the prosecutor's comments were an accurate statement of the law under *Hoge*, 276 Kan. at 812. The argument merely explained that Kesselring could be found guilty of first-degree murder even if the jury did not unanimously find him guilty of pre-

meditated murder and did not unanimously find him guilty of felony murder. The jury could unanimously find Kesselring guilty of murder in the first degree on the combined theories of premeditated murder and felony murder. The argument was consistent with the instruction given the jury regarding felony murder and premeditated murder as alternative theories of proving first-degree murder. The instruction provided:

"In this case, the State has charged the defendant with one offense of murder in the first degree and has introduced evidence on two alternative theories of proving this crime.

"The State may prove murder in the first degree by proving beyond a reasonable doubt that the defendant killed Dale A. Miller and that such killing was done while in the commission of aggravated kidnapping, or in the alternative by proving beyond a reasonable doubt that the defendant killed Dale A. Miller intentionally and with premeditation, as fully set out in these instructions.

"Where evidence is presented on two alternate theories of proving the crime charged, you must consider both in arriving at your verdict.

"In Instruction No. 10, the Court has set out for your consideration the essential claims which must be proved by the State before you may find the defendant guilty of felony murder, that is the killing of a person in the commission of aggravated kidnapping.

"In Instruction No. 9, the Court has set out for your consideration the essential claims which must be proved by the State before you may find the defendant guilty of premeditated murder.

"If you do not have a reasonable doubt from all the evidence that the State has proven murder in the first degree on either or both theories, then you will enter a verdict of guilty.

"If you have a reasonable doubt as to the guilt of the defendant as to the crime of murder in the first degree on both theories, then you must enter a verdict of not guilty."

This instruction followed PIK Crim. 3d 56.02-A and has been approved by this court. *E.g., Hoge*, 276 Kan. at 810-14. In turn, the prosecutor's argument was consistent with the instruction and explained to the jury that a unanimous verdict was required under either individual theory or a combined theory of guilt.

Kesselring also argues that the prosecutor's statement to the jury during closing argument "that only six of the jurors need find that Defendant committed aggravated kidnaping, seriously call[s] into question the aggravated kidnaping verdict." This argument completely mischaracterizes what the prosecutor said. The prosecutor

told the jury that, with regard to the alternative theories of first-degree murder, if six jurors agreed on the theory of premeditation and six jurors agreed on the theory of felony murder, the jury could still properly find Kesselring guilty of first-degree murder. The prosecutor never told the jury that only six of them need find Kesselring guilty of aggravated kidnapping.

### Multiple Acts Analysis Regarding Kidnapping Charge

In another argument, Kesselring contends there was no unanimous jury verdict on the charge of aggravated kidnapping because there were multiple acts which could have constituted the crime and the jury was not given a unanimity instruction. Kesselring contends the kidnapping could have occurred

"either when the victim went out onto the porch when Callarman knocked, when the victim was taken to the car, when the victim was returned to the car by Holmes at gunpoint after leaving the car, after the stop at the house when the victim appeared not to be distressed, or when the victim was removed from the car later."

"In a multiple acts case, several acts are alleged and any one of them could constitute the crime charged. . . . [Citations omitted.] Whether a case is a multiple acts case is a question of law over which this court has unlimited review. [Citation omitted.]" *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003). The threshold question in a multiple acts analysis is whether defendant's conduct is part of one act or represents multiple acts which are separate and distinct from each other. *State v. Staggs*, 27 Kan. App. 2d 865, 867, 9 P.3d 601, *rev. denied* 270 Kan. 903 (2000).

In *Staggs*, the defendant, who stood convicted by a jury of aggravated battery, argued that some jurors may have found that he kicked the victim, while others may have found that he punched the victim, thereby requiring a unanimity instruction on multiple acts. The *Staggs* court held:

"[T]he evidence here supports only a brief time frame in which the aggravated battery occurred. Once defendant initiated the altercation, no break in the action of any length occurred, and the confrontation continued until defendant broke the victim's cheekbone. Simply put, the evidence established a continuous incident that simply cannot be factually separated. No 'multiple acts' instruction was necessary." 27 Kan. App. 2d at 868.

A parallel analysis is appropriate in this case. The evidence establishes a continuous incident that cannot be factually separated. "Incidents are factually separate when independent criminal acts have occurred at different times or when a late criminal act is motivated by 'a fresh impulse.'" *State v. Hill*, 271 Kan. 929, 939, 26 P.3d 1267 (2000). Although we have previously used this test as part of the harmless error analysis in *Hill*, it is also an appropriate test for determining the threshold question of whether multiple acts are involved.

In this case, although the events transpired over a longer period of time, there were no breaks in the sequence of events sufficient to establish separate criminal acts. The crime of kidnapping, as compared to the crime of battery involved in *Staggs*, may occur over a longer period of time. Yet a kidnapping over several hours or days could not be broken into several crimes. Under the facts of this case, the length of time involved does not prevent a finding of a continuous incident. Furthermore, the moving of a kidnapping victim from one location to a car and from the car to another location does not constitute separate acts. Similarly, the fact that Miller was momentarily free when he attempted to escape was not a sufficient interruption to say that a new criminal impulse or new act of kidnapping had occurred. The evidence was that the interruption was not appreciable.

If the State had charged Kesselring with separate counts of kidnapping based on each act that Kesselring attempts to separate, the issue of multiplicity could have been justly raised. The incident here was not susceptible to dissection into further components that would constitute multiple acts; rather, it was a continuous incident that cannot be factually separated. Therefore, we find this was not a multiple acts case and no multiple acts instruction was necessary to ensure that the jury's verdict was unanimous.

## Verdict Form

In a related argument, Kesselring contends the jury instructions were inadequate because they did not include a verdict form which would have allowed the jury to specify whether it unanimously agreed on each theory of first-degree murder. In support, Kessel-

ring cites *State v. Hoge*, 276 Kan. 801, a case where the jury was given such a verdict form.

In this case, the jury was instructed on felony murder and premeditated murder as alternative theories of proving first-degree murder consistent with PIK Crim. 3d 56.02-A. Although the jury was not given a verdict form like the one found at PIK Crim. 3d 68.16 which would have allowed the jury to specify whether it unanimously agreed on each theory of first-degree murder, the evidence was sufficient to support Kesselring's conviction under either alternative means and the jury instruction clearly informed the jury that a unanimous verdict was required for a conviction under either or both theories of guilt. Therefore, there is no reason to doubt the jurors' unanimity regarding first-degree murder, and Kesselring's conviction need not be reversed for lack of unanimity. See *Hoge*, 276 Kan. at 814. The lack of a verdict form only affects the ability of the trial court to sentence Kesselring for premeditated murder. See *State v. Vontress*, 266 Kan. 248, 264, 970 P.2d 42 (1998). Accordingly, the remaining issue to address is whether Kesselring was properly sentenced for felony murder rather than premeditated murder.

### Did the Trial Court Err in Sentencing Kesselring?

Kesselring argues that he was improperly sentenced for first-degree premeditated murder when there was no indication the jury made a unanimous finding of guilt on premeditated murder.

We stated in *Vontress*: "Where the sentencing court cannot ascertain whether the jury unanimously convicted the defendant of both premeditated murder and felony murder, the sentencing court has no authority for sentencing the defendant for premeditated murder." 266 Kan. at 264.

However, the State contends the trial court was well aware of this limitation and properly sentenced Kesselring for felony murder. According to the State, the trial court sentenced Kesselring to life in prison with parole eligibility after 20 years pursuant to K.S.A. 2004 Supp. 21-4706 and K.S.A. 2004 Supp. 22-3717(b)(2). K.S.A. 2004 Supp. 21-4706 provides that the sentence for off-grid crimes "shall be imprisonment for life." K.S.A. 2004 Supp. 22-3717(b)(1)

sets parole eligibility for first-degree premeditated murder at 25 years, while subsection (b)(2) sets parole eligibility for other off-grid offenses, which includes felony murder, at 20 years.

The record reflects that this issue was raised at the sentencing hearing when defense counsel asked the trial court to make a finding that Kesselring would be parole eligible after 20 years rather than 25 because the jury did not specify whether it had convicted him under a theory of premeditation or felony murder. The prosecutor agreed that Kesselring would be parole eligible after 20 years but questioned whether the trial court needed to make a specific finding on the issue, stating that the Department of Corrections could make the determination. In announcing the life sentence, the trial court did not make a specific ruling as to Kesselring's parole eligibility; rather, the court simply sentenced Kesselring to imprisonment for life. However, the journal entry of sentencing reflects that Kesselring was sentenced to life with parole eligibility after 20 years for his first-degree murder conviction.

Thus, the record makes clear that Kesselring was properly sentenced for felony murder, not premeditated murder. Kesselring's argument on this point fails.

### Should the Jury Have Been Instructed on Lesser Included Offenses?

Next, Kesselring argues that the trial court should have instructed the jury on the lesser included offenses of kidnapping, criminal restraint, and second-degree murder. The record reflects that the jury instructions originally contained lesser included offense instructions for kidnapping and criminal restraint, but the parties agreed to delete those instructions, and the trial court found they would be inconsistent with each party's theory of the case. Defense counsel did not request an instruction on second-degree murder, nor did he object that no such instruction was given.

"In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to the crime charged and any lesser included crime.

. . . .

"No party may assign as error the giving or failure to give an instruction, including the lesser included crime instruction, unless the party objects thereto

before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous." K.S.A. 2004 Supp. 22-3414(3).

The failure to give a lesser included offense instruction is clearly erroneous " 'only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred.' [Citation omitted.]" *State v. Drennan*, 278 Kan. 704, 712, 101 P.3d 1218 (2004).

In support of his argument that the trial court should have instructed the jury on the lesser included offenses of kidnapping and criminal restraint, Kesselring contends there was conflicting evidence about whether weapons or threats were used to take Miller from his friend's house. Kesselring also points out that Holmes admitted he was the one who located Miller and returned him to the car at gunpoint after Miller tried to escape.

For purposes of this case, kidnapping is defined as the taking or confining of any person, accomplished by force or threat, with the intent to hold such person to inflict bodily injury or terrorize him or her. K.S.A. 21-3420. Aggravated kidnapping includes the additional element that bodily harm was inflicted on the victim. K.S.A. 21-3421. Criminal restraint is defined as "knowingly and without legal authority restraining another person so as to interfere substantially with such person's liberty." K.S.A. 21-3424.

The State's evidence established that Kesselring and Holmes forced Miller into their car, that both men threatened Miller with guns, and that Kesselring verbally threatened Miller before killing him. Kesselring maintained that he was not present and did not participate in any of this conduct. Based on the evidence, the jury could have either convicted Kesselring of aggravated kidnapping or acquitted him. It could not reasonably have convicted Kesselring of mere kidnapping or criminal restraint. Thus, the trial court did not err in failing to instruct on those lesser included offenses.

Next, we must consider whether the trial court's failure to instruct the jury on the lesser included offense of second-degree murder was clearly erroneous. When, as in this case, the jury does not unanimously agree on the underlying theory for first-degree murder, the question of whether lesser included instructions

should have been given is analyzed under both the felony-murder theory and the premeditation theory. *State v. Hoge*, 276 Kan. at 805. "Under the felony-murder theory, lesser included offense instructions are unnecessary unless the evidence of the underlying felony is weak, inconclusive, or conflicting. [Citation omitted.]" *Hoge*, 276 Kan. at 805. Under the premeditation theory, the usual rules for lesser included offense instructions apply. *Hoge*, 276 Kan. at 805.

Kesselring argues that the evidence of his guilt on the underlying felony of aggravated kidnapping was weak, inconclusive, and conflicting, but that was simply not the case. The evidence was sufficient to establish Kesselring killed Miller during the commission of an aggravated kidnapping. While it is true that the State's witnesses were less than ideal, and there were some conflicts between the testimony of the various witnesses and also between their testimony and previous statements to police, on the key points, all of the witnesses told the same story — that Kesselring was present and participated in the kidnapping of Miller and that he shot and killed Miller. Although Holmes was the only eyewitness to the murder, other witnesses placed Kesselring in the company of Holmes, Callarman, and Reece on the night of the murder. Further, several witnesses placed the .22 caliber gun in his possession; Holmes had a Tek 9. The bullets recovered from the body were .22 caliber. Accordingly, the trial court did not err in failing to instruct the jury on second-degree murder as a lesser included offense of felony murder.

As to whether the trial court should have instructed on second-degree murder as a lesser included offense of premeditated first-degree murder, the court must examine whether there was any evidence to support a conviction of second-degree murder. Second-degree murder is defined as the killing of a human being committed intentionally or "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 2004 Supp. 21-3402. Kesselring does not specify whether he believes the jury should have been instructed on both of these theories of second-degree murder or only one.

In support of his argument on this point, Kesselring relies on the prosecutor's argument that Kesselring and Holmes might have kidnapped Miller and taken him out to the country, but that Holmes might actually have been the triggerman. The prosecutor made this argument to the jury in explaining the purpose of the aiding and abetting instruction. The prosecutor told the jury that if it concluded that Holmes was actually the triggerman, Kesselring would still be guilty as an aider and abettor if it was reasonably foreseeable that Miller would be killed during the aggravated kidnapping.

However, even under this scenario, Kesselring still would not be entitled to a jury instruction on second-degree murder. Kesselring would still be guilty of premeditated first-degree murder, only as an aider and abettor. Kesselring's argument on this point fails. There was no evidence to support a conviction for second-degree murder; thus, the trial court's failure to give a lesser included instruction on that offense was not clearly erroneous.

In his reply brief, Kesselring also complains of the prosecutor's statement that "if Defendant was present, he was good for all of it." The prosecutor's actual statement was, "If he admits to participation on any level under the aiding and abetting principles of felony murder, he's good for all of it. So it should not have surprised you that he denies any participation whatsoever in the commission of his crime. He can't admit to any of it." According to Kesselring, but for this statement by the prosecutor, the jury could have convicted him of either of the lesser included crimes of kidnapping or criminal restraint if the jury believed his version of events — that he saw Reece, Callarman, and Holmes on the night in question and knew they were going to talk to Miller but then left. This argument simply makes no sense. If the jury believed Kesselring's version of the events, it would have acquitted him of all the charges. The jury could not possibly have convicted Kesselring of kidnapping or criminal restraint based on Kesselring's mere knowledge that others were going to talk to Miller about the missing drugs.

We find no error arising from the trial court's failure to give the lesser included offense instructions.

*Was Kesselring's Right to a Fair Trial Violated by References
to Polygraph Examinations Taken by Two Witnesses?*

Next, Kesselring argues that his right to a fair trial was violated by the admission of testimony regarding polygraph examinations taken by Holmes and Reece. Kesselring concedes that he did not object to this testimony and, in fact, his own defense counsel elicited the testimony. Nonetheless, he contends the trial court could have corrected the error *sua sponte* pursuant to K.S.A. 22-3423 by declaring a mistrial.

We reject Kesselring's argument on this point. "When a statement is elicited by defense counsel, the defendant may not complain of that error on appeal. [Citation omitted.]" *State v. Hernandez*, 253 Kan. 705, 716, 861 P.2d 814 (1993). Although the invited error rule cannot be used as pretext for violating a defendant's constitutional rights, any error in the mention of the polygraph examinations does not rise to level of constitutional error. See *State v. Deal*, 271 Kan. 483, 492, 23 P.3d 840 (2001) (mere mention of the word "polygraph" is not grounds for a mistrial).

*Did the Trial Court Err in Admitting the Hearsay Statements
of Deceased Witness Reece?*

Kesselring's next argument is that the trial court erred in admitting the hearsay statements of Reece, deceased.

Kesselring cites to a number of places in the record where various witnesses testified about Reece's statements. However, in most cases, no objection to the evidence was lodged. Kesselring asserts that specific objections were not made because he had a continuing objection to the hearsay. However, the record indicates otherwise. After considering Kesselring's pretrial motion in limine, the trial court refused to make a blanket ruling that any statement made by Reece was inadmissible hearsay and informed defense counsel, "I will need to hear the questions and rule at the time the questions are asked, so make your objections then during the trial, please."

Where a defendant fails to timely object at trial to alleged hearsay statements, he is precluded from challenging the admission of those statements on appeal. *State v. Mays*, 277 Kan. 359, 384, 85

P.3d 1208 (2004). Thus, only those hearsay statements to which defense counsel objected need be discussed.

Our standard of review begins with the general rule that "unless otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f)." *State v. Marsh*, 278 Kan. 520, 530, 102 P.3d 445 (2004). Hearsay evidence is not admissible unless it falls within an exception recognized in K.S.A. 2004 Supp. 60-460. If a trial court errs in the admission or exclusion of evidence, the harmless error rule of K.S.A. 60-261 applies. Under that rule, an error in the admission or exclusion of evidence is not grounds for granting a new trial or setting aside a verdict unless refusal to take such action appears inconsistent with substantial justice. We "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *State v. Morris*, 255 Kan. 964, 983, 880 P.2d 1244 (1994).

Our review of the record revealed only seven hearsay objections which were made during trial, one by the prosecutor and six by defense counsel. Almost every time an objection was made, the trial court either limited the answer to a "yes" or "no," required the attorney to restate the question so it did not call for hearsay, or did not allow the question. We, therefore, need not discuss these questions and objections because, ultimately, no hearsay was admitted. There were only two exceptions.

First, during the prosecutor's examination of Heather regarding a confrontation she had with Reece on the day after the murder, the following exchange took place:

"Q: Ms. Reece, I believe when we left off you had just left your father's house after confronting him, you and Mike got into a confrontation.
"A: Yeah.
"Q: What happened next?
"A: I got home and I asked him why.
"Q: You asked who, Mike Reece?
"A: Yeah, I asked Mike Reece why, why everything happened, why he had to — why things took place the way they did. Why did he involve my dad and just, you know, just asked him why, basically why.
"Q: What happened then?

"A: You know, he made the usual accusations that I said before about me and Dale and he wouldn't be surprised if I was involved with him and just stuff like that and —"

At this point, defense counsel objected on the grounds that "anything further would be hearsay." The prosecutor agreed, and the trial court asked the prosecutor to clarify his question. The prosecutor asked Heather to describe only what happened and not to talk about what Reece had said. Defense counsel did not ask that Heather's response be stricken as hearsay, and Heather did not attempt to further describe her conversation with Reece. These few words of hearsay were harmless.

Second, the prosecutor asked Callarman to describe the conversation Callarman heard between Kesselring, Holmes, and Reece on the morning after the murder. Defense counsel objected on the grounds that anything Reece said was hearsay. The trial court overruled the objection and admitted the testimony under the hearsay exception for statements of coconspirators. Callarman then testified that Reece asked where the body was and said that if the body was not buried and the shell casings not picked up then the job was not done right and had to be finished.

The court then reconsidered its ruling and determined that neither the coconspirator exception of K.S.A. 2004 Supp. 60-460(i)(2) nor the vicarious admissions exception of K.S.A. 2004 Supp. 60-460(i)(1) applied because the prerequisites for those exceptions had not been met. Specifically, the trial court found that, in order to be admissible, the statement must have been made by a third party and Callarman was himself a coconspirator, not a third party. Furthermore, to be admissible, the statement must have been made outside the presence of the accused, but, in this case, the statement was made while Kesselring was present. Although the court concluded it had erred in admitting the hearsay evidence, the court found that Callarman's testimony about Reece's statement was not prejudicial to Kesselring.

Kesselring does not specifically mention this one statement that was admitted over his objection, nor does he specifically challenge the trial court's ruling with regard to that statement. Likewise the State has little to say, merely arguing that "the court took appro-

priate steps to ensure the situation was dealt with appropriately" and did not act arbitrarily, fancifully, or unreasonably; thus, the court did not abuse its discretion.

Because Kesselring has not briefed the issue of whether the trial court erred in finding Callarman's testimony about Reece's hearsay statement was admissible and then reversing its prior ruling and finding the evidence should not have been admitted but was not prejudicial, that issue is deemed abandoned. See *State v. Martis*, 277 Kan. 267, 295, 83 P.3d 1216 (2004) (issue not briefed is deemed abandoned). In any event, the trial court correctly ruled that any error in the admission of this single statement by Reece was harmless. See *State v. Flynn*, 274 Kan. 473, 513, 55 P.3d 324 (2002) (improper admission of hearsay evidence found to be harmless beyond a reasonable doubt). Additionally, this statement was not testimonial and, therefore, we need not engage in a constitutional harmless error analysis. See *Crawford v. Washington*, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004); *State v. Meeks*, 277 Kan. 609, 613, 88 P.3d 789 (2004).

In addition to complaining about admission of Reece's hearsay statements, Kesselring also argues the trial court erred in admitting the testimony of Agent Hupp regarding his interviews with various witnesses who testified at trial. All of that testimony was clearly admissible since the witnesses interviewed by Hupp were present at trial and available for cross-examination. See K.S.A. 2004 Supp. 60-460(a). The only time a hearsay problem arose was where Agent Hupp testified about what the witness told him Reece said. Kesselring accurately contends such evidence was double hearsay; however, Kesselring never objected to any of Agent Hupp's testimony on hearsay grounds. His failure to make a contemporaneous objection requires us to reject his argument.

### Did the Trial Court Err in Admitting Kesselring's Mail into Evidence?

Kesselring's final argument on appeal is that the trial court erred in admitting into evidence letters Kesselring wrote to his mother. Kesselring contends admission of the letters violated his Fifth Amendment right to be free from self-incrimination. Kesselring

also intimates, without making a clear argument, that the seizure of the letters violated the Fourth Amendment to the United States Constitution because the letters were opened "as part of a pattern to detect drug trafficking and [defendant's] expectation of privacy [was] violated."

In responding to Kesselring's argument, the State first discusses the letters Kesselring wrote to Callarman and the handwriting exemplars obtained from Kesselring. However, Kesselring is not challenging the admission of either his letters to Callarman or the handwriting exemplars. With regard to the letters to Kesselring's mother, the State argues those letters were never seized by the State, therefore they could not have been admitted in violation of Kesselring's Fourth Amendment rights.

There were several sets of letters and other examples of Kesselring's handwriting admitted at trial, but the only letters to Kesselring's mother were letters Kesselring himself offered as defense exhibits. Kesselring wrote those letters to his mother while he was in Norton Correctional Facility (Norton), and his mother testified it appeared the letters had been opened by Norton before being sent to her. Certainly, Kesselring cannot complain on appeal that the trial court erroneously admitted evidence which Kesselring himself introduced. See *State v. Hebert*, 277 Kan. 61, 78, 82 P.3d 470 (2004) (litigant may not invite trial court into error and then complain of error on appeal).

Furthermore, Kesselring did not object to the admission of any of the letters on the grounds that their seizure by Norton violated his constitutional rights; therefore, he is precluded from raising such an argument on appeal. See K.S.A. 60-404; *State v. Diggs*, 272 Kan. 349, 365, 34 P.3d 63 (2001) (party must make timely and specific objection to admission of evidence at trial in order to preserve issue for appeal).

Affirmed.

LOCKETT, J., Retired, assigned.