(166 P.3d 1075)
No. 93,413

STATE OF KANSAS, *Appellee*, v. RICO L. GLYNN, *Appellant*.

Opinion filed September 14, 2007.

*Carl F.A. Maughan* and *Shawn Lautz*, of Maughan Hitchcock LC, of Wichita, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Phill Kline*, attorney general, for appellee.

Before RULON, C.J., GREENE, J., and LARSON, S.J.

LARSON, J.: This direct appeal of Rico L. Glynn's jury convictions of aggravated kidnapping, rape, and aggravated criminal sodomy raises a first impression issue in Kansas of whether deoxyribonucleic acid (DNA) testing evidence lawfully obtained in a different

case may be utilized in this or a separate case to establish necessary elements of a criminal prosecution.

We hold there is no constitutional violation or infringement of any rights of privacy when the police use a DNA profile lawfully obtained in one case to investigate and charge the DNA donor in a subsequent and different case or cases.

Glynn raises the above issue by contending the district court erred in denying his motion to suppress in this case. He also claims the trial court abused its discretion in denying his motion for a change of venue, the charges for which he was convicted were multiplicitous, and there was insufficient evidence to support his conviction, which requires we set forth the sordid details of the alleged criminal conduct in considerable detail.

### FACTUAL AND PROCEDURAL BACKGROUND

On the evening of January 30, 2003, while driving home from her chemistry class at Wichita State University, K.F. stopped at a convenience store to buy a few things, leaving her extended cab pickup unlocked when she went inside. After K.F. returned to her truck and started to drive to her nearby home, a man grabbed her from the back seat, held a knife to her throat, and warned her not to move or she would be killed. Continuing his threats, the man directed K.F. to make a U-turn. K.F. complied; she then asked the man if he wanted money and if he was going to hurt her. The man responded that he thought she was somebody else.

The man then directed K.F. to turn into a dark alley and turn off the truck. When K.F. turned off her truck, the man became irritated because the dome light came on automatically. He yelled at her to turn it off, ordered her not to look at him, and told her to get in the back seat. When K.F. unsuccessfully attempted to escape, the man grabbed her and pulled her into the back seat.

Once K.F. was in the back seat, the man pulled K.F.'s pants and underwear down to her knees. The man then inserted his finger into her vagina, asking her if it felt good. K.F. repeatedly said "no" and begged the man to stop. After he removed his finger from her vagina, the man masturbated. He then pulled K.F.'s pants to her

ankles and performed oral sex on K.F. as she continued begging him to stop.

Recognizing that she could not escape with her pants and underwear around her ankles, K.F. removed these items as the man performed oral sex on her. The man then sat up, looked around, and reached through the seats to make sure the doors were locked, becoming frustrated when he could not figure out the locks. K.F. took that opportunity to crawl between the seats to the front, telling the man that she was trying to help him. Once in the front seat, K.F. escaped through the passenger door and ran down the street screaming for help. Tuan Tran heard the screaming, opened his door, and offered K.F. help. Tran then took K.F. into his home, gave her a blanket and clothing, and called 911 and K.F.'s husband on her behalf because she was too scared to talk.

When the police questioned K.F., she was visibly shaken but explained in detail what had happened. K.F. did not think she could positively identify her attacker because it was dark and he shielded her attempts to see his face, but she described him as a black male with an unkept mustache and braided hair, wearing light blue sagging blue jeans and a white stocking cap. She had noticed the man near the convenience store and the surveillance tape of the parking lot revealed a man with that description near K.F.'s truck, but the man could not be identified.

Eugene Jacobs, a crime scene investigator, processed K.F.'s truck in the dimly lit alley that same night but did not find any fingerprints that could be used to identify a suspect, nor did his attempts to find bodily fluids by the use of an ultraviolet light prove successful, so the truck was released. But, the next day, Jacobs met K.F.'s husband in the city parking garage and at that time, Jacobs was able to see a small amount of bodily fluid on the back seat. After field testing showed it was semen, Jacobs removed the fabric on which it was located for additional laboratory testing.

Shelly Steadman, the biology and DNA laboratory manager at the Sedgwick County Regional Forensic Science Center, obtained a genetic profile of the suspect through DNA testing on the bodily fluid found on the seat. That DNA profile did not match any of the profiles the police had given Steadman for comparison to iden-

tify a suspect. Steadman's lab retained and preserved the fabric and the DNA file.

The investigation continued for several months without success. About 3 months after the crimes against K.F. occurred, police began investigating Glynn's possible involvement in a Wichita home invasion during which a man cut a woman's throat in front of her son and daughter and then stabbed the son. The daughter positively identified Glynn as the assailant, and a cell phone call confirmed Glynn's involvement.

Detective Phil Jacob located Glynn at Lansing Correctional Facility and went there with another officer to attempt to question him. At this point, it was suspected that Glynn might be involved in the crimes against K.F. Glynn would not consent to providing a DNA sample, but Jacob had prepared an affidavit based on all of the facts in the home invasion case for a court-ordered search warrant for two saliva samples by swabbing the inside of each of Glynn's cheeks.

A comparison of Glynn's DNA profile to the DNA profile derived from the bodily fluid found on K.F.'s truck seat revealed the profiles were consistent, meaning Glynn could not be excluded as its possible source. In terms of statistical probability, chances that a randomly selected, unrelated person (other than Glynn) contributed to the DNA found on the truck seat were 1 in 3.94 septillion for the African-American population, 1 in 30.8 septillion for the Hispanic population, and 1 in 1.28 septillion for the Caucasian population.

Glynn was charged with attempted first-degree murder, two counts of aggravated battery, and attempted aggravated battery, in No. 03 CR 1254, the home invasion case. He was later charged with aggravated kidnapping, rape, and aggravated sodomy in No. 03 CR 1459, the case involving the attack on K.F. and the subject of the appeal before us.

Senior Judge William F. Lyle, Jr., presided over both cases and kept them together for control purposes only because of the interrelation of motions filed in the cases. The home invasion case was tried first and the jury convicted Glynn of all charges. Glynn appealed those convictions, and a panel of this court affirmed all of

the convictions but remanded for consideration of Glynn's ability to pay the Board of Indigents' Defense Services attorney fees. *State v. Glynn*, No. 93,124, unpublished opinion filed April 6, 2007 (*Glynn I*). Glynn's petition for review is currently pending before our Supreme Court.

On June 10, 2003, the State charged Glynn in our case with aggravated kidnapping, rape, and aggravated sodomy. Prior to trial, Glynn moved for a change of venue, which was denied and renewed, and argued a pro se motion to suppress similar to one that had been denied by the court in the home invasion case, which was likewise denied in our case.

After the State presented to a jury the factual and DNA evidence earlier described, the trial court denied Glynn's motion for acquittal and submitted the case. The next morning the jury returned a guilty verdict on all three counts.

The trial court subsequently sentenced Glynn to concurrent terms of 620 months' imprisonment for aggravated kidnapping, 155 months for rape, and 117 months for aggravated sodomy, with post-release supervision. The trial court further ordered the sentences to run consecutive to Glynn's sentences in the home invasion case and any other sentences Glynn was serving at the time.

Glynn has timely appealed.

## DENIAL OF THE SUPPRESSION MOTION

We first consider Glynn's claim that the district court erred in denying his motion to suppress DNA evidence obtained by a search warrant in a separate case.

Our standard of review is well known as we review the factual underpinnings of the decision on a suppression motion by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. Appellate courts do not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006).

This case is complicated considerably by the lack of finality of *Glynn I* and the fact that Glynn has reiterated all of the arguments he made below and on appeal in *Glynn I* (the home invasion case).

He raises additional issues in our case, primarily the contention that it was a violation of his constitutional rights to use the DNA evidence obtained in the home invasion case in order to positively identify Glynn as K.F.'s attacker.

In arguing the motion to suppress the DNA evidence prior to the trial in our case, Glynn's counsel noted the issues had been thoroughly discussed in the prior hearings on the same suppression issues during the home invasion trial and he requested the record incorporate the testimony from that hearing which had been held before the same judge. The State joined in that request. That testimony provided, in pertinent part, the following facts.

After one of the victims of the home invasion identified Glynn as the attacker and additional investigation suggested Glynn's involvement in the crime, Detective Jacob located Glynn at the Lansing Correctional Facility. On June 4, 2003, Jacob and his partner traveled to Lansing to meet with Glynn, who was brought into an interrogation room in shackles and handcuffs. Jacob informed Glynn that they were there to speak to him regarding a residential robbery in Wichita. Glynn voluntarily provided his personal history. However, when Jacob asked if Glynn was willing to talk about the home invasion, Glynn responded by laughing and pointing out that he did not have an attorney with him.

Jacob then *Mirandized* Glynn who reiterated his refusal to speak with Jacob without the presence of an attorney. Jacob then told Glynn he would return to Wichita and contact the district attorney's office to seek charges against Glynn for attempted first-degree murder and aggravated robbery. Glynn responded by saying he "didn't agree" with one of those charges and said he wanted to talk. Before speaking to Glynn, Jacob asked him to indicate on the *Miranda* form that he would answer questions without having counsel present and Glynn did so.

Jacob then conducted a tape recorded interview of Glynn concerning the home invasion in which Glynn said he had a crack cocaine addiction. Glynn told Jacob he never demanded money and claimed that he just entered the home and "stood there quietly." Glynn claimed he did not recall cutting the woman's throat, but he did remember struggling with her son.

At the end of the interview, Jacob asked Glynn to provide a saliva sample, but Glynn refused. Glynn testified in the suppression hearing in our case that he refused because he had spoken to a friend who told him police were trying to link him to a Wichita rape case. After Glynn's refusal, Jacob presented an application for a search warrant to a Leavenworth County district judge. In the warrant affidavit, Jacob cited as probable cause all the information he had obtained in investigating the home invasion case, including one victim's positive identification of Glynn and the presence of a knife blade covered with blood at the scene. Jacob sought the warrant to obtain Glynn's saliva so his DNA profile could be compared to the DNA sample taken from the knife. Jacob testified in the suppression hearing in our case that he was focused on the home invasion case.

A Leavenworth District Court Judge issued a search warrant and Jacob returned to Lansing with the warrant and, pursuant to his training, obtained two saliva samples from Glynn by swabbing the inside of his right and left cheeks. As has been earlier stated, Glynn's DNA profile obtained by the warrant was later found to be consistent and identical to the DNA profile derived from the bodily fluid found on K.F.'s truck seat.

Judge Lyle denied the motion to suppress in our case, as he had in the home invasion case. And, in response to Glynn's argument that it was improper to use the DNA profile, he found no Kansas law on point but held the DNA was like physical evidence in one case being used in another and found no valid reason that Glynn's DNA profile was not admissible in his prosecution for K.F.'s attack. This obviously led to the conviction and the contention by Glynn on appeal here that the judge's ruling was erroneous and requires reversal. We will consider each of Glynn's arguments.

## SEARCH AND SEIZURE ISSUES
### Voluntariness of Glynn's statements

Glynn argues here, as he did in *Glynn I*, that his statements to Jacob should be suppressed. This argument, although linked to his next contention, relates totally to the home invasion case, did not involve any testimony in our trial, and is without merit as it relates

to the issues in our case. Additionally, the same arguments regarding the statement and confession in the home invasion case were rejected in *Glynn I*, slip op. at 5-7.

### *Exclusion of DNA evidence as fruit of the poisonous tree*

Glynn contends here the DNA sample was obtained as a part of his involuntary and coerced confession in the home invasion case and that as the result of his refusal to voluntarily provide a saliva sample, Jacobs applied for, obtained, and executed the search warrant to seize the DNA sample.

The State convincingly responds that the interview was not mentioned in the affidavit requesting the search warrant and the interview and obtaining of the sample are separate events. In fact, the application for the search warrant had been prepared in Wichita before the interview at Lansing took place.

While it is true that if the confession was wrongfully obtained, any evidence obtained as the result thereof would be prohibited as the fruit of a poisonous tree doctrine, see *State v. Walker*, 283 Kan. 587, 603, 153 P.3d 1257 (2007), there is no wrongfully obtained confession here. The acquiring of the saliva sample was a separate and distinct act from the interrogation.

Jacob admitted he was aware that Glynn may have been involved in another incident prior to the home invasion but testified he was "not familiar with what evidence they had in their case. That was not anything that [he] was part of." It is important to note that Eugene Jacobs, the crime scene investigator who investigated K.F.'s attack, and Detective Phil Jacob, who interviewed Glynn at Lansing and obtained the saliva sample, are different individuals despite the similarity in their names.

The search warrant was obtained to compare Glynn's DNA profile with that found on the knife used in the home invasion. There was not, at the time it was obtained, any known connection to the rape case. There is no poisoned tree here, no fruit of such a tree, and no basis to suppress in our case for acts and actions clearly involving a different and separate case.

## Scope of the search warrant

Glynn next argues that Jacob exceeded the scope of the search warrant in obtaining not one but two saliva samples, which included the taking of skin cells, which was not authorized. Neither of these arguments have any merit but will be briefly discussed.

Both the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights protect the rights of the people against unreasonable searches. Both provide that "no [w]arrant[s] shall issue, but upon probable cause, supported by [o]ath or affirmation, [and] particularly describing the place to be searched and the persons or [property] to be seized." U.S. Const. Amend. IV; Kan. Const. Bill of Rights, § 15. K.S.A. 22-2502(a) likewise requires a person seeking a search warrant to "particularly describe[ ] a person, place, or means of conveyance to be searched and things to be seized." Such particularity is required to prevent general searches and the seizure of items at the discretion of the officer executing the warrant. *State v. LeFort*, 248 Kan. 332, Syl. ¶ 1, 806 P.2d 986 (1991). "The test is one of practical accuracy rather than one of technical sufficiency, and absolute precision is not required in identifying the property to be seized. [Citations omitted.]" *State v. Ames*, 222 Kan. 88, 92, 563 P.2d 1034 (1977).

In the home invasion case, the search warrant listed the item to be obtained as "1. Saliva Sample." There were several spaces to the right of the numeral "1" and no indication that the State was to be limited to the collection of a single sample.

Glynn's argument here and in *Glynn I* is obtuse but contends that because only one sample was allowed, the second sample should be suppressed and because it had become so linked with the first sample that both samples had to be suppressed. Detective Jacob had testified that he always took two saliva samples using two swabs from the inside of each cheek "[e]very single time" he had taken DNA saliva swabs in his career in law enforcement.

Glynn's argument was found to be without merit in *Glynn I*, slip op. at 22-23. There was no limitation to a "one cheek swab," and the "1" related to the item sought and not the number of swabs that could be utilized to obtain a saliva sample.

Glynn argues for the first time in our case that it was improper for skin cells to be obtained, which was not authorized by the search warrant.

This argument is rejected for consideration on appeal as it was not raised before the trial court, *State v. Rojas*, 280 Kan. 931, 932, 127 P.3d 247 (2006); there is no authority given in support of this new argument, which amounts to it being waived and abandoned, *State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 (2006); and there was a logical nexus between the saliva sample and skin cells, thus the scope of the warrant was not impermissibly exceeded.

Finally, Glynn says that a swab would not have been required if Glynn had merely been required to expectorate his saliva into a cup. The test is one of reasonableness under the Fourth Amendment, not least intrusive means. As explained in *United States v. Sharpe*, 470 U.S. 675, 686-87, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985):

"A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But '[t]he fact that the protection of the public might, in the abstract, have been accomplished by "less intrusive" means does not, by itself, render the search unreasonable.' [Citations omitted.] The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."

The manner of obtaining a saliva sample from Glynn in this case was not unreasonable.

*State's use of Glynn's DNA profile obtained in the home invasion case in investigating and prosecuting the attack on K.F.*

Because we have no controlling cases in Kansas on the precise question raised and the facts are not disputed, we conduct an unlimited review of this suppression question. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006).

Glynn makes multiple arguments why the trial court erred in not suppressing his DNA profile because it was obtained for his home invasion case but ultimately used to connect him to the attack on K.F.

His first argument is that three separate searches occurred; the first was when his saliva was obtained, the second when his saliva was used to obtain his DNA to compare to the DNA at the home invasion, and the third when his DNA was entered into the COTIS system to identify characteristics that could be compared to the DNA of the material found in K.F.'s truck. He claims the third search violated his Fourth Amendment rights.

The State's response suggests that only one lawful search occurred; when the saliva was obtained as authorized by the search warrant. It argues that law enforcement officers are not prohibited from using evidence obtained in one case in an unrelated case and that there was no additional seizure or invasion of Glynn's privacy because the initial saliva sample was obtained by the use of a valid search warrant.

We agree with the State's argument. There was only one search.

Glynn argues he has an expectation of privacy in his DNA and that it may not be used beyond the specific purpose of the warrant, a comparison in the home invasion case. He would require the State to obtain a separate search warrant to search his saliva and the DNA profile obtained therefrom before making any comparison to the material found in the vehicle where K.F. was attacked.

Glynn's authority for his argument is *State v. Rupnick*, 280 Kan. 720, 125 P.3d 541 (2005), where it was held that a valid search warrant is necessary for law enforcement to search the hard drive of a suspect's personal computer. In reaching this conclusion, the majority opinion relied on two Tenth Circuit Court of Appeals cases, *United States v. Carey*, 172 F.3d 1268, 1273-75 (10th Cir. 1999), and *United States v. Walser*, 275 F.3d 981 (10th Cir. 2001), *cert. denied* 535 U.S. 1069 (2002). The two federal cases turned on whether the search exceeded the scope of the warrant; it was held to have done so in *Carey*, but it did not in *Walser*, where the search was stopped when what was believed to be child pornography was first seen. In *Rupnick*, the search warrant in issue was held to be invalid because of jurisdictional limitations. 280 Kan. at 734-35. But these three decisions relate to multiple types of different information that might be found in a computer and do not directly relate to the single question of the utilization of DNA pro-

file evidence lawfully in the possession of the law enforcement officers.

The State argues for an overly broad reading of *State v. Goodman*, 3 Kan. App. 2d 619, 599 P.2d 327 (1979), which is really a plain view case where a gun lawfully seized after being seen in a vehicle was returned to the vehicle to determine who might attempt to unlawfully obtain its possession. We do not think *Goodman* or *Rupnick* are persuasive authority for the question before us.

When faced with the identical issue, all the authorities we have located conclude that once law enforcement has lawfully obtained a blood sample and DNA therefrom, a defendant has no additional constitutional protected privacy in that evidence and it may be used in the investigation of other crimes for identification purposes without the necessity of a separate warrant.

In discussing a situation where a blood sample had been obtained for purposes of DNA analysis, 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 5.3(c) n.130, p. 176 (4th ed. 2004), broadly states:

"Such information about the defendant may already be available, however, obviating the need to obtain a new blood sample for this purpose. The blood sample may have been lawfully obtained in investigating another crime on an earlier occasion, as in *State v. Hauge*, 103 Haw. 38, 79 P.3d 131 (2003), or may have been obtained incident to a prior conviction of the defendant pursuant to a statute of the kind discussed in § 5.4(c). The defendant cannot object to use of that information in the instant case, for, as held in *Hauge*, 'once a blood sample and DNA profile is lawfully procured from a defendant, no privacy interest persists in either the sample or the profile.' Accord: *People v. Baylor*, 97 Cal.App.4th 504, 118 Cal.Rptr.2d 518 (2002); *Washington v. State*, 653 So.2d 362 (Fla. 1994); *Bickley v. State*, 227 Ga.App. 413, 489 S.E.2d 167 (1997); *Smith v. State*, 744 N.E.2d 437 (Ind. 2001); *Wilson v. State*, 132 Md.App. 510, 752 A.2d 1250 (2000); *People v. King*, 232 A.D.2d 111, 663 N.Y.S.2d 610 (App.Div. 1997); *State v. Barkley*, 144 N.C.App. 514, 551 S.E.2d 131 (2001)."

The most in-depth and best discussion of our issue is found in *State v. Hauge*, 103 Hawaii 38, 79 P.3d 131 (2003). The issue there is identical to the one we face.

Hauge's blood was lawfully obtained by a valid search warrant as part of a robbery investigation. The police requested that a lab

analyze and compare Hauge's DNA obtained from his blood sample to DNA from blood recovered in the investigation of a separate burglary investigation. The lab found the DNA profiles matched and defendant was arrested in connection with the burglary.

Hauge's motion to suppress was denied and after his conviction, he argued on appeal that the usage of his DNA exceeded the limited purpose of the search warrant and violated his legitimate expectations of privacy under the Hawaii and United States Constitutions. Hauge also argued that allowing usage of his DNA lawfully obtained undermines probable cause requirements and approving such police actions would allow them to compile a DNA data bank of generic information far more intrusive than fingerprint comparisons.

None of Hauge's arguments were found to be persuasive by the Hawaii Supreme Court.

As to the argument that a suspect retained an expectation of privacy in his DNA profile obtained by a valid search warrant, *Hauge* considered and applied the two-part expectation of privacy analysis set forth in *Katz v. United States*, 389 U.S. 347, 361, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967) (Harlan, J., concurring), which provides: " ' "First, [the person] must exhibit an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable." ' [Citations omitted.]" *Hauge*, 103 Hawaii at 51.

*Hauge* then adopted the rule already recognized in several other states that expectations of privacy in lawfully obtained blood samples "are not objectively reasonable by 'society's standards' " so there is no constitutional violation or infringement of privacy. Once a DNA profile is lawfully obtained, a defendant has no privacy interest which persists in either the sample or the profile. 103 Hawaii at 51-52. The *Hauge* opinion cited as authority all of the other decisions we have previously set forth in the LaFave quotation above and discussed several of those cases. See *Hauge*, 103 Hawaii at 51.

The *Hauge* opinion adopted the reasoning in *Bickley v. State*, 227 Ga. App. 413, 489 S.E.2d 167 (1997), stating: "We agree with the trial court that '[i]n this respect, DNA results are like finger-

*prints which are maintained on file by law enforcement authorities for use in further investigations.' Bickley*, 489 S.E.2d at 169 (emphasis added)." *Hauge*, 103 Hawaii at 52.

In response to the "parade of horrible" usage argument, the Hawaii Supreme Court limited police usage of the DNA for the purposes for which police could have utilized a fingerprint in such an investigation, *i.e.*, identification. 103 Hawaii at 52-53.

The analysis of the Hawaii appellate court and the decisions of the other states cited therein, California, Florida, Georgia, Indiana, Maryland, New York, and North Carolina, are sound and should be joined by Kansas. We so hold.

The State makes an inevitable discovery argument contending that because Glynn was convicted of attempted first-degree murder and aggravated robbery in the home invasion trial, pursuant to K.S.A. 2006 Supp. 21-2511, he would be required to submit blood and saliva specimens which would ultimately provide a match. See *State v. Maass*, 275 Kan. 328, 337, 64 P.3d 382 (2003) (upholding validity of K.S.A. 2001 Supp. 21-2511). Because *Glynn I* is still pending and our record below is insufficient to support this inevitable discovery argument, it will not be considered.

For all the reasons we have above stated, the trial court correctly overruled Glynn's motions to suppress and the DNA evidence was legally and lawfully admitted and utilized in the trial of this case.

We will briefly consider Glynn's remaining allegations of error, but none of them have merit.

## DENIAL OF CHANGE OF VENUE MOTION

Glynn claims the trial court erred in not granting his change of venue motion.

The determination of whether to change venue is entrusted to the sound discretion of the trial court and such discretion will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. *State v. Higgenbotham*, 271 Kan. 582, Syl. ¶ 4, 23 P.3d 874 (2001).

Glynn argues he could not obtain a fair and impartial trial in Sedgwick County because of publicity surrounding his home invasion trial and arrest in the rape and attack of K.F.

The record does not support Glynn's allegations. A jury was selected without difficulty or knowledge of the case. The jury was correctly admonished to not consider any outside information. After the jury announced it had reached a verdict on the morning after the case had been submitted, defense counsel expressed concern about possible media prejudice. The trial court apparently did visit with the jurors and stated, "They were all unfamiliar with Rico Glynn and expressed great surprise at his previous record and why it wasn't a part of the trial."

The record shows no possibility of prejudice. The trial court did not abuse its discretion in denying the change of venue motions.

## MULTIPLICITY OF CHARGES

Glynn next makes a multiplicity argument, which is a question of law subject to unlimited review. *State v. Robbins*, 272 Kan. 158, 171, 32 P.3d 171 (2001).

Glynn's argument that the crimes of aggravated kidnapping, rape, and aggravated sodomy are multiplicitous is based on his contention that they arise out of a single act of violence. Any such argument has been abrogated by our Supreme Court decisions in *State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006), and *State v. Patten*, 280 Kan. 385, 122 P.3d 350 (2005) which have held the test to determine multiplicity is whether each offense requires proof of an element not necessary to prove the other offenses. If this is the case, the charges stemming from a single act are not multiplicitous.

Glynn's counsel candidly admits in his brief that if a strict element test is used, the three convictions are not multiplicitous. When we properly apply the tests of *Schoonover* and *Patten*, there is no multiplicity in this case. Glynn's multiplicity arguments have no merit.

## SUFFICIENCY OF EVIDENCE

" 'When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Kesselring*, 279 Kan. 671, 679, 112 P.3d 175 (2005).

Because the weight to be afforded the evidence and credibility determinations are within the jury's province, those matters will not be second guessed on appeal. 279 Kan. at 679. Moreover, a conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Dixon*, 279 Kan. 563, 621, 112 P.3d 883 (2005).

Glynn attacks the sufficiency of the evidence as to his identity as K.F.'s attacker and his intent to take and confine K.F. by force or threat and to rape and sodomize her.

There is no merit to either argument as the first only has validity if the DNA evidence was improperly admitted. We have specifically held that it was correctly considered by the jury and clearly showed Glynn was directly linked to the crime.

K.F.'s testimony of the brutal, nonconsensual nature of the force used, the knife at her throat, and sexual actions satisfying the elements of both rape and sodomy clearly provided substantial competent evidence of Glynn's guilt beyond a reasonable doubt.

Affirmed.