No. 97,013

STATE OF KANSAS, *Appellee*, v. MARY ANN WRIGHT, *Appellant*.

(224 P.3d 1159)

Opinion filed February 26, 2010.

*Michelle Davis*, of Kansas Appellate Defender Office, argued the cause, and was on the briefs for appellant.

*Jan Satterfield*, county attorney, argued the cause, and *Steve Six*, attorney general, was with her on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: This is a direct appeal from defendant Mary Ann Wright's conviction of rape. Wright argues that there was insufficient evidence to convict her of rape by force or fear and that the district court erred in admitting evidence under K.S.A. 60-455.

## FACTUAL AND PROCEDURAL BACKGROUND

Wright provided massages out of her home. She was primarily self-taught, learning with the aid of books and videos from the library. Wright's clients included J.L., age 21.

On the day the rape allegation arose, J.L. arrived at Wright's home for a massage. Wright asked J.L. if she would be interested

in a full body massage. When J.L. had agreed, J.L. disrobed and covered herself with a beach towel. She first lay face down. Wright massaged J.L.'s back, buttocks, legs, and feet and then asked J.L. to roll over. J.L. felt uneasy as Wright began massaging the top of her breasts but assumed it was part of the full body massage. J.L. dozed off as Wright began massaging her calves and feet. When she woke up, she saw Wright's hand and arm between her legs and felt Wright's fingers moving in and out of her vagina. J.L. became tense; Wright stopped; and J.L. left.

J.L. did not contact the Leon Police Department until the next day. The police referred her to the Butler County Sheriff's Department.

J.L. met with a sheriff's deputy and informed him that she fell asleep during the massage, woke up, and discovered Wright penetrating her vagina with two fingers. J.L. said that "she was startled at first and afraid. Then she got mad and felt like getting up and hitting [Wright]. But she was too afraid and [Wright] said something to the effect that she just wanted her to experience the full massage . . . .[J.L.] said that . . . it paralyzed her [with fear]."

J.L. also mentioned that another of Wright's clients had told her that Wright asked an inappropriate question during a massage. The second client eventually told the sheriff's deputy that Wright had offered her a genital massage.

As the investigation continued, a female detective with the Sedgwick County Sheriff's Office scheduled a massage by Wright. Eventually, this detective would testify at trial about her experience with Wright. The detective said that the massage was significantly different from other massages she had received. Wright had removed a towel so that the detective lay on the massage table undressed and uncovered. In addition, Wright made her uncomfortable with certain of her motions during the massage of the detective's buttocks and touched the detective's breasts with her palm. According to the detective, Wright also offered her a genital massage.

A search of Wright's home eventually resulted in seizure of several pornographic videos and books. During the search, the Butler County sheriff's deputy informed Wright of her *Miranda* rights.

Wright agreed to talk to the deputy, confessing that she had offered genital massages to some of her clients. Wright said that "[f]or a female [a genital massage] was a massage of the outer lips and also the vagina . . . . On a male . . . it was a massage of the penis until ejaculation." Wright also admitted that she may have slipped and accidentally inserted her finger into J.L.'s vagina.

A second Butler County sheriff's investigator also interviewed Wright, who told him that a "genital massage is when . . . the male penis and the woman's vaginal area was massaged." Wright again admitted that she had offered genital massages to her clients but said that none had accepted. She initially denied inserting her fingers into J.L.'s vagina but later said that she had used vegetable oil for J.L.'s massage, that the oil was slick, and that her finger may have slipped into J.L.'s vagina while she was massaging her thigh. Wright also admitted that she visited pornographic sites of nude women and acknowledged that she was bisexual, but Wright said she had never acted on her sexual attraction to women. Wright said she had become sexually excited while giving her first few massages but had since "been able to block that out."

Wright then wrote a statement about her encounter with J.L.:

"I accidentally slipped my index finger into the outer vagina about one half inch when massaging [J.L.] May of 2005. I was massaging her inner thighs when this occurred. It was not intentionally done. And I am very sorry it happened . . . . I did not do this on purpose, as I am not doing massages for sexual gratification. I am doing it for others to help relieve stress, tension and [to promote] general good health."

The State charged Wright with one count of rape. The State filed a pretrial motion seeking to admit evidence of (1) Wright's offers of genital massage to the second client and the Sedgwick County sheriff's deputy, and (2) her expression of her sexual attraction to other women. The State argued this evidence was relevant to prove absence of mistake or accident under K.S.A. 60-455. During a hearing on the motion, the State also sought admission of Wright's statement that she had visited pornographic websites to prove Wright's state of mind and intent. Wright argued that the evidence was highly prejudicial and irrelevant. The district judge ruled in favor of the State, saying:

"[I]n the case before the court the defendant does not deny the intercourse but asserts mistake or lack of intent to rape. Mistake or accident denotes an honest error. This defense is completely consistent with the [*State v. Davidson*, 31 Kan. App. 2d 372, 379-82, 65 P.3d 1078 (2003),] rationale for admitting K.S.A. 60-455 evidence when, in fact, it is proper to be admitted.

"This court further finds (1) the evidence is relevant to prove one of the facts specified in the statute; (2) the fact is a disputed material fact; and (3) the probative value of the evidence outweighs its prejudicial effect for the reasons and rationale [as] set forth in the State's memorandum and brief pursuant to the applicable case law therein.

"Finally, pursuant to [*State v. Morgan*, 207 Kan. 581, 485 P.2d 1371 (1971)], this Court finds the prior act is admissible, irrespective of a conviction."

During trial, J.L. testified about her meaning when she described "dozing off" during her massage:

"Q. [Y]ou had never fallen asleep during these [massages]?
"A. I would doze off on occasion.
"Q. When was that?
"A. Any time I would be relaxed enough to close my brain — my brain was relaxed. I couldn't call it sleeping. I wasn't in a complete deep sleep like I do every night when I go to bed.
"Q. So the — but you still you went ahead and fell into a deep sleep the first time you are getting this full body massage?
"A: There is a difference between sleeping maybe five minutes or so and sleeping eight hours.
"Q: There was a — there was a level of sleep you were in? Were you asleep or not asleep during this full body massage?
"A: That's — I dozed off to sleep. It was not a very deep sleep like I am when I sleep a full eight hours."

The second client to whom investigators had been directed by J.L. testified that Wright had informed her during a massage that "she could do neck, shoulders, back, full body, genitals." She also testified that she had stopped going to Wright for massages because Wright became "scary," once calling her 20 times in a 6-hour period. Another day, the client testified, her caller identification system showed 28 calls from Wright. Wright also had left notes on the second client's car and had asked children to bring notes to the client's workplace.

Wright testified in her defense. She addressed one of the videos seized during the search of her home, saying she had ordered it from a catalog and did not realize it was erotic:

"A. I still didn't realize [it was erotic] until you are all talking about it up here. I looked at the title and it says Tantric Massage.

. . . .

"Q. Okay and [the video] includes hand massages, if you will, of males to the point of ejaculation, correct?

"A. Yes.

"Q. And it includes genital massages, [including] penetration to the point of climax or orgasm, correct?

"A. Yes.

"Q. And you don't consider that sexual?

"A. It is sexual, but it was in the massage and I thought that was part of the massage. Having never had a massage myself I did not know."

Wright also asserted that she had made her statements to the Butler County sheriff's investigator under stress:

"A. . . . [The investigator] started talking about did I touch [J.L.] accidentally? And I said, I don't think so. I don't know. Because it had been [a]while since I had given [J.L.] a massage and I was really in a state of shock.

. . . .

"A. [The investigator] said, now think about it. I said, well, I might have had, because I was not sure. And he kept at me and saying, well, are — you have to be really sure. And I [sat] there maybe two minutes. I said, well, I did apparently touch [J.L.] accidentally."

Wright also testified that she had identified herself as bisexual but had never acted upon her sexual attraction to other women and had not obtained sexual gratification through her massage practice. She tried to explain why she had not completely covered the Sedgwick County sheriff's deputy with a towel and said she had offered her a genital massage:

"A. I had a towel there. And I have found out since that I should have kept [the deputy] covered. My massage material that I had showed totally nude without cover.

. . . .

"A. I thought that was the way it should be done. I hadn't learned any better.

"Q. Did you at any point have a discussion with [the deputy] about a genital massage?

"A. Yes, I did.

"Q. And how did that come up?

"A. Well, [the deputy] was laying on the table and I said, well I'm finished. I kind of chuckled and said, unless you want a genital massage. I was just . . . smarting off. I really didn't mean to give her a genital massage. I have never given

one. I have offered them to a couple people. But it's not — not something I would solicit that way."

When Wright testified about J.L.'s massage, she said:

"A. Well, when I accidentally touched her on the genitals with my finger and I was, oops, sorry, there was no response whatsoever. And I realized then that she was asleep.

"Q. So what did you do?

"A. I basically quit the massage. Went over and sat at the computer and played games until she woke up, which was about 15 minutes later."

The defense argued that the instructions to the jury should not permit consideration of whether Wright raped J.L. through force or fear, because the evidence was insufficient on that alternative means of committing the crime. The State argued that J.L.'s statement that she had been paralyzed with fear once she woke up and realized what was happening could establish this element of the crime.

The district judge decided that the jury should be instructed on alternative means of committing rape—by force or fear or by unconsciousness. Instruction No. 5 thus provided that Wright could be convicted if "the act of sexual intercourse was committed without the consent of J.L. under circumstances when: (a) she was overcome by force or fear; or (b) she was unconscious or physically powerless."

The district judge also gave a K.S.A. 60-455 limiting instruction, explaining that evidence "tending to prove that the defendant committed bad acts other than the present crime . . . may be considered solely for the purpose of proving [Wright's] intent or absence of mistake or accident."

Before deliberations began, the parties and the judge also discussed the design of the verdict form, the judge suggesting that it could be appropriate to list the two alternative means of committing rape, giving the jury options to convict Wright on either, both, or neither. The State agreed, but defense counsel advocated for a general verdict form:

"I think that would be the best way to provide the jury with the ability to express [a] unanimous conclusion. The method by which they reach that conclusion is

within their province. We have already told them in the last instruction before the verdict form, your agreement on a verdict must be unanimous.

"We are instructing you separately and independently that there is some ability to be less than unanimous in sort of a verdict, then I think we are inviting fraction—we're inviting a division. I think we are being somewhat contradictory to the instruction that's in the final instruction and the cleanest and best way to get their decision, regardless of how they reach it, is by saying guilty or not guilty of rape in the first instance and allowing the verdict must be unanimous. Suffice it to assist insofar as directing the outcome."

The judge followed defense counsel's recommendation on the verdict form, and the jury returned a general verdict of guilty.

Wright appealed her conviction to our Court of Appeals, arguing that the State presented insufficient evidence to support a conviction of rape by force or fear. Wright also asserted error in the admission of evidence about her two offers of genital massage, because such "[e]vidence of an individual's willingness to perform a sexual act is different from an act of rape." Wright further argued that this evidence—as well as the evidence that she visited pornographic websites, owned erotic videos, and was bisexual—could not be categorized as evidence of other crimes or civil wrongs under K.S.A. 60-455. She also asserted that the severe prejudice arising from these items of evidence outweighed their probative value.

The Court of Appeals panel affirmed Wright's conviction. See *State v. Wright*, No. 97,013, unpublished opinion filed June 6, 2008. Addressing the sufficiency of evidence argument, the panel cited *State v. Dixon*, 279 Kan. 563, 604-06, 112 P.3d 883 (2005), and *Griffin v. United States*, 502 U.S. 46, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991), holding that an alternative means case can be affirmed "if there is strong evidence supporting one theory and no evidence supporting the other theory" because any error is harmless. *Wright*, slip op. at 10. "Wright effectively concedes there was enough evidence to convict her under the 'unconscious or physically powerless' scenario due to J.L. being asleep when the penetration occurred." Slip op. at 7. The panel also held that Wright's K.S.A. 60-455 arguments were not properly before the court because Wright failed to make a contemporaneous objection to the contested evidence at trial. *Wright*, slip op. at 12.

This court granted Wright's petition for review.

Alternative Means and Sufficiency of the Evidence

Both parties agree:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Gutierrez*, 285 Kan. 332, 336, 172 P.3d 18 (2007).

Wright contends that the State's proof of rape by force or fear was insufficient because penetration and fear did not occur simultaneously. She does not challenge the adequacy of the State's proof on unconsciousness. Because, she asserts, one of the alternative means of committing rape was not proved, she is entitled to reversal under *State v. Timley*, 255 Kan. 286, 875 P.2d 242 (1994). *Timley* required sufficiency of evidence to support each alternative means upon which a jury is instructed, in order to protect a criminal defendant's right to a unanimous jury verdict. The State, on the other hand, urges this court to affirm *Dixon* as an exception to the *Timley* rule and to hold that any gap in the State's proof was harmless error.

Jury unanimity on guilt in a criminal case is statutorily required in Kansas. See K.S.A. 22-3421; Beier, *Lurching Toward the Light: Alternative Means and Multiple Acts Law in Kansas*, 44 Washburn L.J. 275, 277-79 (2005). This court has ruled that in an alternative means case "[t]here must be jury unanimity as to guilt for the single crime charged, but not as to the particular means by which the crime was committed." See *State v. Stevens*, 285 Kan. 307, 314, 172 P.3d 570 (2007).

The court first addressed alternative means in *State v. Wilson*, 220 Kan. 341, 552 P.2d 931 (1976). In *Wilson*, the State argued at trial that defendant David Wilson committed first-degree murder either by " 'willful, deliberate and premeditated killing' [or by] 'a killing in the perpetration or attempt to perpetrate a robbery.' " *Wilson*, 220 Kan. at 344. The district court instructed the jury on both theories, and the jury convicted Wilson of first-degree murder. *Wilson*, 220 Kan. at 342, 344.

On appeal, Wilson argued that the district court erred in instructing the jury on both theories because:

"[I]t becomes impossible to determine which of the two theories the jury found was supported by the evidence . . . . [S]ome members of the jury may have found appellant guilty of a premeditated killing and others a felony murder, and . . . this would not be a unanimous verdict as required by our law." *Wilson*, 220 Kan. at 344.

This court, acknowledging that it faced a question of first impression, rejected *Wilson*'s argument:

"When an accused is charged in one count of an information with both premeditated murder and felony murder it matters not whether some members of the jury arrive at a verdict of guilt based on proof of premeditation while others arrive at a verdict of guilty by reason of the killer's malignant purpose. In such case the verdict is unanimous and guilt of murder in the first degree has been satisfactorily established. If a verdict of [first-degree] murder *can be justified on either of two interpretations of the evidence*, premeditation or felony murder, the verdict cannot be impeached by showing that part of the jury proceeded upon one interpretation of the evidence and part on another." (Emphasis added.) *Wilson*, 220 Kan. at 345.

Although this holding from *Wilson* necessarily depended on the existence of sufficient evidence on each alternate theory, it is rarely cited for an alternative means rule. Instead, *Timley*, 255 Kan. 286, a 1994 case, became the lead precedent in alternative means law.

In *Timley*, defendant Irvin Timley argued that the district "court erred in instructing the jury that it could find him guilty if it found that [his] sexual act was perpetrated by use of force *or* fear." (Emphasis added.) *Timley*, 255 Kan. at 288. Timley contended that because some jurors could have found him guilty by force and others by fear, unanimity of the verdict was in question. *Timley*, 255 Kan. at 288-89.

The court ultimately rejected Timley's argument, stating:

" 'In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.] In reviewing an alternative means case, the court must determine whether a rational trier of fact *could* have found each means of committing the crime proved beyond a reasonable doubt. [Citations omitted.]' " *Timley*, 255 Kan. at 289.

The court then held that there was sufficient evidence to convict Timley of rape and aggravated criminal sodomy either by force or by fear; thus "[t]here was no error in including both alternative means in one instruction to the jury." *Timley*, 255 Kan. at 289-90. The indispensable component in the court's holding was "super-sufficiency" of evidence, *i.e.*, proof adequate to persuade a rational factfinder of Timley's guilt on rape by fear *and* rape by force. See Beier, 44 Washburn L.J. at 283, 294, 296-99 (discussing "super-sufficiency"). If evidence had been lacking on either means alleged, Timley's rape conviction would have been reversed.

Several alternative means cases followed, adopting the *Timley* analytical pattern. See *State v. Morton*, 277 Kan. 575, 580-81, 86 P.3d 535 (2004) (sufficient evidence existed to convict defendant of first-degree murder by premeditation or felony murder); *State v. Hoge*, 276 Kan. 801, 813, 80 P.3d 52 (2003) (court must follow *Timley*'s test if determining jury unanimity in an alternative means case); *State v. Beach*, 275 Kan. 603, 623, 67 P.3d 121 (2003) ("[u]nder the alternative means analysis, 'unanimity is not required . . . as to the means by which the crime was committed so long as substantial evidence supports each alternative' "); *State v. Carr*, 265 Kan. 608, 963 P.2d 421 (1998) (adopting *Timley*), *abrogated on other grounds State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006); *State v. Kelly*, 262 Kan. 755, 760-61, 942 P.2d 579 (1997) (same); see also *State v. Alford*, 257 Kan. 830, 896 P.2d 1059 (1995) ("defendant's reliance on *Timley* for the rule that substantial evidence must support each alternative means of committing the offense of aggravated kidnapping is correct").

*Dixon* struck out in a different direction.

In that case, the State charged defendant Wallace Dixon with two counts of burglary, one for each time he unlawfully entered an apartment. For each count, the district court instructed:

"To establish this charge, each of the following claims must be proved:
"1. That [Dixon] knowingly entered or remained in a building which is a dwelling;
"2. That [Dixon] did so without authority;
"3. That [Dixon] did so with the intent to commit a theft and/or aggravated arson, a felony, and/or criminal damage to property, a felony therein." *Dixon*, 279 Kan. at 601.

Citing *Timley*, Dixon argued that substantial evidence did not exist to support the first charge; the State provided no evidence indicating he had the intent to commit aggravated arson the first time he entered the apartment. *Dixon*, 279 Kan. at 602. The majority of this court agreed. *Dixon*, 279 Kan. at 603-04; compare *Dixon*, 279 Kan. at 622 (Beier, J., concurring in part and dissenting in part). But it quoted from a significant portion of *State v. Johnson*, 27 Kan. App. 2d 921, 923-26, 11 P.3d 67, *rev. denied* 270 Kan. 901 (2000), departing from *Timley*:

" 'Despite the language of *Timley*, courts of appeal have attained a degree of confidence in jury verdicts of guilt in cases where there is overwhelming evidence supporting the conviction under one of the alternative means. Those courts have concluded that it was harmless error in such cases for the trial court to instruct on all alternatives.

" 'Our Supreme Court dealt with such a scenario in *State v. Grissom*, 251 Kan. 851, 840 P.2d 1142 (1992). The *Grissom* court held that a general verdict of first-degree murder could be upheld if there was sufficient evidence to convict the defendant of either first-degree premeditated murder or felony murder, and the State was not required to prove both. [Citation omitted.]

" '*Grissom* adopted the view taken by the United States Supreme Court in *Griffin v. United States*, 502 U.S. 46, 59-60, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991), with the following:

" 'Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence [citation omitted]. . . .'

" '[I]f the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration. The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction.' " 251 Kan. at 892.

. . . .

" '. . . In a *Griffin* situation, one can reasonably assume the jury did not behave capriciously and convict on a theory in which there was no evidence, when there was strong evidence supporting another theory.' 27 Kan. App. 2d at 7." *Dixon*, 279 Kan. at 605-06.

The court then determined that "there was strong evidence supporting at least one theory of each burglary and no evidence of at least one other theory" and that the erroneous burglary instructions were harmless. *Dixon*, 279 Kan. at 606.

The same day that *Dixon* was filed, this court handed down *State v. Kesselring*, 279 Kan. 671, 112 P.3d 175 (2005). *Kesselring* mentioned neither *Dixon* nor *Timley* but followed *Timley*'s alternative means analysis.

In *Kesselring*, defendant Michael W. Kesselring argued that "there was insufficient evidence to convict him of first-degree murder under a theory of either premeditation or felony murder." *Kesselring*, 279 Kan. at 678. This court, quoting the alternative means test from *Timley* as outlined in *State v. Hoge*, 276 Kan. 801, 813, 80 P.3d 52 (2003), held that there was sufficient evidence to support a conviction of first-degree murder under either theory and that the prosecutor's argument consistent with the test was proper. *Kesselring*, 279 Kan. at 679-82.

Since 2005, this court has acknowledged the tension between *Timley* and *Dixon*, but not resolved it. See *State v. Cook*, 286 Kan. 1098, 191 P.3d 294 (2008) (appearing to rely in part on *Dixon*); compare *Stevens*, 285 Kan. at 316 (citing *Kesselring* for posing issue "whether sufficient evidence supports both means" of committing driving under the influence).

This decision does so. Although *Dixon* has obvious pragmatic appeal,

"it simply cannot coexist with *Timley* peacefully, providing a benign route to harmless error. . . . [A] reversal mandated by *Timley* is a reversal for *insufficient evidence*. An insufficiency error cannot be harmless because it means the State failed to meet its burden of proving the defendant guilty beyond a reasonable doubt. This is a most basic guarantee of due process in criminal cases. [Citation omitted.]

"The *Timley* super-sufficiency condition evolved for a good reason. It evolved because we recognized that we were allowing uncertainty as to how the State persuaded each juror. We were comfortable with this uncertainty—at that particular level of generality in the jury's factfinding—only because we insisted on assurance that each juror's vote was supported by a means for which there was sufficient evidence. Without that assurance, we are back to where we were before *Timley*. We have no guarantee that the jury was unanimous at the level of factual generality that matters most of all: guilt v. innocence." Beier, *Lurching Toward*

*the Light: Alternative Means and Multiple Acts Law in Kansas*, 44 Washburn L. J. 275, 299.

We are now persuaded that the *Timley* alternative means rule is the only choice to ensure a criminal defendant's statutory entitlement to jury unanimity. Any contrary language in *Dixon* is specifically disapproved.

We now turn to application of the *Timley* rule to the facts of this case. Wright argues that the State's proof of the alternative means of force or fear was inadequate. As mentioned above, she insists that the initial vaginal penetration had to be contemporaneous with J.L.'s fear.

K.S.A. 21-3502 provides: "Rape is: . . . [s]exual intercourse with a person who does not consent to the sexual intercourse, . . . [w]hen the victim is overcome by force or fear." K.S.A. 21-3501(1) defines "sexual intercourse" as "any penetration of the female sex organ by a finger, . . . . Any penetration, however slight, is sufficient to constitute sexual intercourse."

Analyzing K.S.A. 21-3501(1) and K.S.A. 21-3502(a)(1)(A), this court in *State v. Bunyard*, 281 Kan. 392, 412, 133 P.3d 14 (2006), determined that "[K.S.A. 21-3502(a)(1)(A)] proscribes *all* nonconsensual sexual intercourse that is accomplished by force or fear, not just the initial penetration." Although the facts of this case can be distinguished from those in *Bunyard*—the victim in *Bunyard* initially consented to the sexual intercourse but withdrew her consent after initial penetration—its holding has application here. Moreover, *Bunyard* recited that the majority of our sister states had agreed that rape could be accomplished at some point in time after initial penetration. See *Bunyard*, 281 Kan. at 411-13; see also *State v. Baby*, 404 Md. 220, 240, 946 A.2d 463 (2008) ("crime includes post-penetration vaginal intercourse accomplished through force or threat of force and without the consent of the victim, even if the victim consented to the initial penetration").

The evidence in this case was sufficient to find Wright guilty beyond a reasonable doubt of committing rape by force or fear. J.L. testified that she woke to the realization that Wright was digitally penetrating her vagina and was paralyzed with fear. Under

*Bunyard*, it does not matter that the initial penetration by Wright may not have been temporally coincidental with J.L.'s fear; it is enough that the penetration and fear were eventually contemporaneous. There is no error under the *Timley* alternative means rule here, because the evidence of each means of committing rape— by force or fear or by unconsciousness—was sufficient to uphold a guilty verdict on the rape charge.

### K.S.A. 60-455 EVIDENCE

Wright also argues that the Court of Appeals erred by failing to address her K.S.A. 60-455 argument. She did not object to the prior acts evidence admitted during trial. Although Wright did challenge the K.S.A. 60-455 evidence pretrial, the issue is not properly before the court now under K.S.A. 60-404. We have interpreted that statute's requirement of a "timely" objection to evidence to require a contemporaneous objection during trial. See *State v. King*, 288 Kan. 333, 204 P.3d 585 (2009). Although we are doubtful that certain items among the State's K.S.A. 60-455 evidence qualified as prior crimes or civil wrongs, we do not reach the merits of this issue.

Affirmed.

\* \* \*

JOHNSON, J., concurring: I write separately to be consistent with my separate opinion in *State v. Hollingsworth*, 289 Kan. 1250, 221 P.3d 1122 (2009), regarding the interpretation of K.S.A. 60-404 as it relates to preserving an appeal of an adverse evidentiary ruling. Nevertheless, I am convinced that any error in the admissibility of the evidence which Wright labels as K.S.A. 60-455 evidence would not have changed the result of the trial and, therefore, I concur in the majority's result.

In *Hollingsworth*, I pointed out that the plain language of K.S.A. 60-404 only requires that "there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." Where, as here, the district court has considered and ruled on the admissibility of challenged evidence prior to trial, the court has had an opportunity to conduct the trial without tainted evidence and avoid possible reversal or a new trial,

*i.e.*, the purpose of the rule which the statute codifies has been accomplished. See *State v. King*, 288 Kan. 333, 342, 204 P.3d 585 (2009) (stating the purpose of the contemporaneous objection rule). Accordingly, I would find that appellate review of Wright's challenge to the district court's pretrial evidentiary ruling is not precluded by K.S.A. 60-404.