(277 P.3d 435)
No. 105,199

STATE OF KANSAS, *Appellee*, v. RODNEY COLEMAN, *Appellant*.

Opinion filed May 25, 2012.

*Meryl Carver-Allmond*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., McANANY and ATCHESON, JJ.

STANDRIDGE, J.: Rodney Coleman appeals from two separate forgery convictions, one for forgery as defined by K.S.A. 21-3710(a)(2) and the other for forgery as defined by K.S.A. 21-3710(a)(3). Relevant to both convictions, Coleman argues the State failed to present sufficient evidence to establish that he *issued and delivered*—or possessed and intended to *issue and deliver*—a fraudulent check, each of which are alternative means of committing forgery based on the jury instructions at trial. Also relevant to both convictions, Coleman argues the State failed to present sufficient evidence to establish that he knew the check at issue had been fraudulently *made, altered, and endorsed*, each of which—again—are alternative means of committing forgery based on the jury instructions at trial. In the event we are not persuaded to overturn his convictions based on these alternative means arguments, Coleman also argues the two convictions for forgery are multiplicitous and, as a result, one of the convictions must be vacated.

For the reasons stated below, we are not persuaded that the phrases "issuing or delivering" and "issue or deliver" as used in the forgery statute and the jury instructions create two alternative means of committing forgery. Neither are we persuaded that the phrase "made, altered or endorsed" in the forgery statute and the jury instructions creates three alternative means of committing forgery. Nevertheless, we are persuaded that Coleman's convictions for forgery are multiplicitous and that remand is necessary so the district court can vacate one of the convictions. Because Coleman received concurrent sentences for his two convictions, however, there is no need for him to be resentenced.

## FACTS

On April 9, 2010, Coleman walked into a Dillon's grocery store in Wichita and attempted to cash a check at the store's customer

service counter. The check was drawn on the account of Estes Enterprises (Estes) and made payable to Coleman for $640.37. Due to unusual features on the check, Johnnie Webb, the Dillon's employee working behind the counter, had concerns about whether the check was legitimate. While talking with Coleman, Webb signaled to another employee to call 911. Coleman waited at the counter as Webb stalled the check cashing process. Officer Eric Noack of the Wichita Police Department eventually arrived and arrested Coleman. Noack then escorted Coleman to a security office inside the store where Coleman, after being informed of his *Miranda* rights, agreed to speak with Noack.

Coleman told Noack that he cleaned buildings for Estes and that the check was payment for his work. Coleman told Noack that his boss was a woman named Marie Osby. Noack asked how he could contact Osby, and Coleman said he did not have her phone number. He told Noack that whenever he wanted to work, he would show up at an intersection in Wichita at 10:30 p.m. and Osby would pick him up in a white van and take him to various buildings to clean. Coleman said that he received the check from Osby that morning after he met her at a Wal-Mart in Wichita. When Noack asked Coleman how he knew to meet Osby at that particular Wal-Mart, Coleman said that he had just seen her there and received the check.

Noack searched Coleman and found a check stub, which Coleman claimed was once attached to the check from Estes. Although the $640.37 in net pay identified on the check stub matched the amount on the check from Estes, the check stub identified "Lil Le's Childcare Center" as Coleman's employer and not Estes.

Noack eventually transported Coleman to the city building where Bradley Tuzicka, a detective with the financial crimes section of the Wichita Police Department, interviewed him. During the interview, Coleman again explained that the check he attempted to cash was his paycheck from Estes for cleaning buildings and that his boss at Estes, Osby, had given him the check. Coleman explained that Osby was the supervisor of his particular cleaning crew. Coleman said that during the previous evening and into the early morning hours, the crew had cleaned a Ryan's Steakhouse

and an International House of Pancakes (IHOP) restaurant located in the area of K-96 and Rock Road in Wichita. Coleman explained that while at Ryan's, they had vacuumed and mopped the inside of the restaurant and picked up trash around the outside of the building. At IHOP, Coleman said that they had power washed the restaurant's hood vents.

Tuzicka pointed out to Coleman that the name of the payor on the check (Estes) did not match the name of Coleman's employer on the paystub (Lil Le's Childcare Center). In response, Coleman stated that he had not noticed the discrepancy before Tuzicka pointed it out.

Tuzicka eventually left the interview room and called David Christman, the general manager of the Ryan's Steakhouse identified by Coleman as the one they cleaned. Tuzicka asked Christman whether he had hired any outside contractors to clean the restaurant the previous evening. Christman said he had not and explained that the restaurant's employees did most of the cleaning. Christman specifically denied hiring Estes to perform any cleaning of the restaurant.

Tuzicka returned to the interview room and told Coleman that he did not believe his story and that based on his previous experience with investigating check forgery cases, Tuzicka believed Coleman was being exploited by someone who had made a deal with him to cash the check in exchange for a share of the proceeds. Tuzicka also suggested that he knew Coleman was not "trying to hurt anybody like a robber would with a gun." In response, Coleman told Tuzicka that he was right and admitted to receiving the check from a woman named Marie who Coleman had met on a street in Wichita. Coleman told Tuzicka that Marie had made the check and told him what to say if he was caught, but they never reached a final agreement on how they would split the proceeds if Coleman was able to cash the check.

A few days later, Tuzicka contacted Mohamad Issa, the general manager of IHOP, who confirmed that the restaurant's hood vents were not cleaned on or around April 8 by an outside cleaning crew. Like Christman, Issa specifically denied hiring Estes to perform any cleaning of the restaurant.

The State charged Coleman with two counts of forgery under K.S.A. 21-3710(a)(2) and (a)(3) based on his attempt to cash the forged check at Dillon's. Coleman's case proceeded to a jury trial where, in addition to the facts above, the State presented the testimony of Jeanette Garretson, an accountant with Estes. Garretson testified that, although the check looked similar to the ones Estes used, the signature on the check did not belong to any of the three people authorized to sign checks for Estes. Garreston also said that the check was missing a memo line and that the six-digit account number that appeared on the check, while correct, was missing a space between the third and fourth digits of the account number. Finally, the accountant testified that Coleman was never an employee or vendor of Estes, Estes had never issued a check to him, and Coleman never had authority from Estes to cash the check.

Coleman's girlfriend, Lola Ross, testified on Coleman's behalf at trial, stating that Coleman began working for Osby a few days before he was arrested on April 9, 2010. Ross stated that she did not know what type of work Coleman performed for Osby, but she knew that he only worked for Osby during the day and that he received the $640.37 check as a result of his employment with her.

Coleman testified at trial that he began working for Osby in late March and continued working for her until he was arrested on April 9 when he tried to cash the first paycheck he received from her. Coleman said that during his employment with Osby, he worked on a crew that cleaned various buildings and restaurants located in Wichita, Newton, and Andover. He said that whenever he worked for Osby, she would either pick him up at home or would let him know that she would be picking him up at a specific intersection in Wichita. She would then proceed to take Coleman and the rest of the cleaning crew members to various work sites to clean.

Coleman said that the night before he was arrested, he spent several hours cleaning a building in Newton and did not get off work until the next morning. After he got off work, Coleman went to a Wal-Mart in Wichita where Osby had told him to meet her so she could give him his paycheck. At 9:30 a.m., Coleman met Osby at the Wal-Mart and she gave him the $640.37 check. Coleman went to Dillon's to cash the check and thereafter was arrested.

Coleman denied telling Detective Tuzicka that he had cleaned the IHOP or Ryan's Steakhouse located in the area of K-96 and Rock Road during the late evening and early morning hours of April 8 and 9. He also denied admitting to Tuzicka that he knew the check was forged, claiming instead that he received the check as payment for work he performed for Osby and that he believed the check was legitimate when he went to Dillon's to cash it. He specifically denied entering into an agreement to cash a check that he knew was forged in exchange for a share of the proceeds. Coleman claimed he told Tuzicka that he could contact Osby by going to the intersection where she picked Coleman up for work and waiting there for her to arrive. Finally, Coleman acknowledged his signature on the back of the check but claimed that none of the writing on the front of the check was his.

The jury ultimately found Coleman guilty of both counts of forgery. The district court imposed concurrent prison sentences, which resulted in a controlling sentence of 21 months.

## ANALYSIS

### I. *Alternative Means*

Coleman argues his forgery convictions must be overturned because there was insufficient evidence presented at trial to support the alternative means of *issuing and delivering* a check that he knew had been fraudulently *made, altered, and endorsed,* which necessarily makes it impossible to determine whether the jury was unanimous in deciding the means by which he committed both of the crimes charged. Coleman concedes there was evidence presented at the trial to prove that he *delivered* the check knowing that it had been fraudulently *made* and *endorsed,* but he asserts there was no evidence presented to prove that he *issued* the check or that the check had been *altered.*

As Coleman notes, the jury in a criminal case is required to arrive at a unanimous verdict. When the jury is presented with alternative means by which the crime can be committed, it is possible for some jurors to arrive at one alternative means to support a conviction and other jurors to settle on the other alternative means. Notably, our Supreme Court has held that the defendant's right to a unan-

imous verdict is not undermined when this happens so long as there was sufficient evidence presented at trial to support each alternative means for committing the crime. See *State v. Wright*, 290 Kan. 194, Syl. ¶ 2, 224 P.3d 1159 (2010); *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994).

In order to resolve the sufficiency of the evidence issues presented by Coleman, we must decide whether the legislature intended K.S.A. 21-3710(a)(2) and K.S.A. 21-3710(a)(3) to provide alternative means of committing the crime of forgery within each of these subsections. If the legislature did not so intend, our analysis ends. If we determine that the legislature did intend to provide alternative means of committing forgery within these individual subsections of the statute, then we conduct a second analysis to determine whether there was sufficient evidence presented at trial to support a finding by the jury that Coleman *issued* or possessed and intended to *issue* the check knowing that it had been fraudulently *altered*.

A.  *Legislative Intent*

Interpretation of a statute is a question of law over which an appellate court has unlimited review. See *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010). As a general rule, criminal statutes must be strictly construed in favor of the accused. Any reasonable doubt as to the meaning of the statute is decided in favor of the accused. This rule of strict construction, however, is subordinate to the rule that judicial interpretation must be reasonable and sensible to achieve legislative design and intent. *State v. Trautloff*, 289 Kan. 793, 796-97, 217 P.3d 15 (2009).

We begin our analysis with K.S.A. 21-3710(a), which defines the crime of forgery as knowingly and with the intent to defraud:

"(1) *Making, altering or endorsing* any written instrument in such manner that it purports to have been *made, altered or endorsed* by another person, either real or fictitious, and if a real person without the authority of such person; or altering any written instrument in such manner that it purports to have been made at another time or with different provisions without the authority of the maker thereof; or making, altering or endorsing any written instrument in such manner that it purports to have been made, altered or endorsed with the authority of one who did not give such authority;

"(2) *issuing or delivering* such written instrument knowing it to have been thus *made, altered or endorsed*; or

"(3) possessing, with intent to *issue or deliver*, any such written instrument knowing it to have been thus *made, altered or endorsed*." (Emphasis added.)

The first count of forgery against Coleman charged him with violating subsection (a)(3). Accordingly, the jury was instructed that in order to find Coleman guilty on Count 1, it had to find:

"1. That [Coleman] possessed a check which he knew had been *made, altered or endorsed* so that it appeared to have been made at another time, with different provisions by the authority of the maker; to wit: an illegible signature, who did not give such authority;

"2. That [Coleman] intended to *issue or deliver* the check;

"3. That [Coleman] did so with the intent to defraud; and

"4. That this act occurred on or about the 9th day of April, 2010, in Wichita, Sedgwick County, Kansas." (Emphasis added.)

The second count of forgery charged a violation of subsection (a)(2). Consistent with this charge, the jury was instructed that in order to find Coleman guilty on Count 2, it had to find:

"1. That [Coleman] *issued or delivered* a check which he knew had been *made, altered or endorsed* so that it appeared to have been made by the authority of the maker, to wit: an illegible signature, who did not give such authority;

"2. That [Coleman] did this act with the intent to defraud; and

"3. That this act occurred on or about the 9th day of April, 2010, in Wichita, Sedgwick County, Kansas." (Emphasis added.)

Based on the language used in both the statute and the jury instructions, Coleman contends the words *made, altered,* and *endorsed* establish three alternative means of committing forgery and that the words *issued* and *delivered* establish two alternative means of committing forgery. For the reasons stated in *State v. Foster*, 46 Kan. App. 2d 233, Syl. ¶¶ 1-3, 264 P.3d 116 (2011), *rev. granted* 293 Kan. 1109 (February 17, 2012), we are not persuaded by Coleman's argument. We find it worth mentioning that two of the three judges who participated in the *Foster* decision currently sit on this panel.

The *Foster* court began its analysis of this issue by noting that the Kansas Criminal Code did not provide a definition for the words *making, altering,* or *endorsing* or for the words *issuing* or

*delivering.* Because the conduct prohibited by K.S.A. 21-3710(a) relates to negotiable instruments, the *Foster* court turned to the definitions in the Kansas Uniform Commercial Code (UCC). With regard to the phrase "making, altering, or endorsing," the court concluded that the UCC definitions demonstrate that each act related to "the creation of an instrument for the purpose of negotiating it, whether it is the first or a subsequent negotiation." 46 Kan. App. 2d at 240. With regard to the phrase "issuing or delivering," the court concluded that the UCC definitions demonstrate that each act related "to transferring possession of a negotiable instrument that already has been created, whether it is the first or a subsequent transfer." 46 Kan. App. 2d at 240-41. Considering these conclusions in a context consistent with the overall language and structure of K.S.A. 21-3710(a), the court held only one means of committing forgery exists within each of the statute's three separate subsections: (1) creating a fraudulent instrument (subsection [a][1]); (2) transferring a fraudulent instrument (subsection [a][2]); and (3) possessing a fraudulent instrument (subsection [a][3]). 46 Kan. App. 2d at 241.

The *Foster* court acknowledged that its construction of K.S.A. 21-3710(a) was at odds with an earlier decision from this court in *State v. Owen*, No. 102,814, 2011 WL 2039738 (Kan. App. 2011) (unpublished opinion), *rev. granted* 293 Kan. 1112 (2012). The panel in *Owens* concluded that the terms "made, altered, or endorsed" represented three alternative means of committing forgery. 2011 WL 2039738, at *5; see *Foster*, 46 Kan. App. 2d at 243. In reaching this conclusion, the *Owen* panel did not attempt to define the terms "made" and "altered," but instead made its decision solely on the meaning of the word "endorsed" as set forth in Black's Law Dictionary 843 (9th ed. 2009), which limits the definition to the act of signing the back of a check. See *Owen*, 2011 WL 2039738, at *5. Unpersuaded by this analysis, the court in *Foster* found that its construction of K.S.A. 21-3710(a)—incorporating the definitions found in the UCC and construing the statute as a whole—provided the more consistent, harmonious, and sensible conclusion. 46 Kan. App. 2d at 243.

Based on the analysis in *Foster*, we conclude that the legislature intended "issuing or delivering" a written instrument knowing it to have been fraudulently "made, altered or endorsed" as set forth in K.S.A. 21-3710(a)(2) to prohibit the act of transferring a written instrument knowing it to have been fraudulently created and to constitute one means of forgery. Similarly, we conclude that the legislature intended possessing, with intent to "issue or deliver," a written instrument knowing it to have been fraudulently "made, altered or endorsed" as set forth in K.S.A. 21-3710(a)(3) to prohibit the act of possessing, with the intent to transfer, a written instrument knowing it to have been fraudulently created and to constitute one means of committing forgery. Given these conclusions, we now need to decide whether the State presented sufficient evidence to convict Coleman of both counts of forgery under each subsection.

## B. *Sufficiency of the Evidence*

" ' "When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." ' [Citation omitted.]" *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011). In determining whether there is sufficient evidence to support a conviction, an appellate court cannot reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Swanigan*, 279 Kan. 18, 23, 106 P.3d 39 (2005). Furthermore, circumstantial evidence is sufficient to support a criminal conviction and to establish the requisite bad intent. *State v. Richardson*, 289 Kan. 118, 127, 209 P.3d 696 (2009).

As noted above, Coleman's first conviction was grounded in K.S.A. 21-3710(a)(3), which required the State to provide evidence that Coleman knowingly, and with the intent to defraud, possessed a fraudulent check with the intent to transfer (*i.e.*, issue or deliver) possession of the check to another. Coleman's second conviction was grounded in K.S.A. 21-3710(a)(2), which required the State to provide evidence that Coleman knowingly, and with the intent to

defraud, actually did transfer (*i.e.*, issue or deliver) possession of a fraudulent check to another. Coleman does not dispute there was evidence presented at trial that he possessed and subsequently delivered the check to Dillon's with the intent to cash it. Neither does Coleman dispute that there was evidence at trial that the check at issue was fraudulently created to appear as if an authorized person from Estes made out a check dated April 9, 2010, made payable to Coleman for a sum of $640.37.

Coleman does, however, dispute that there was sufficient evidence at trial to establish that he knew the check was fraudulent. But the record contains sufficient evidence to support such a finding. Detective Tuzicka testified at trial that Coleman initially told him during the interview that he worked for Estes cleaning buildings and that the check he attempted to cash was his paycheck from Estes. But testimony from Estes' accountant at trial established that Colman had never worked for Estes. Coleman also told Tuzicka that during the previous night, the cleaning crew he worked on had cleaned a Ryan's Steakhouse and IHOP located in the area of K-96 and Rock Road in Wichita. But after Tuzicka spoke with the manager of Ryan's and confirmed that no outside contractors had cleaned the restaurant the previous night, he suggested to Coleman that his story was false and that he had made a deal with someone to cash the check. According to Tuzicka, at this point, Coleman admitted to receiving the check from a woman named Marie who had told him what to say if he was caught. From this evidence, the jury could properly infer that Coleman knew that the check was fraudulent before he attempted to cash it at Dillon's.

Admittedly, Coleman denied at trial telling Tuzicka that he had cleaned the IHOP or Ryan's Steakhouse located in the area of K-96 and Rock Road the previous evening. He also denied telling Tuzicka that he knew the check was forged, maintaining at trial that he received the check as payment for work he performed for Osby and believed the check was legitimate when he went to Dillon's to cash it. He specifically denied entering into an agreement to cash a check that he knew was forged in exchange for a share of the proceeds. But this court cannot reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence.

*Swanigan*, 279 Kan. at 23. Ample evidence supports the jury's verdicts finding Coleman guilty of both counts of forgery.

## II.   *Multiplicity*

Coleman argues his two convictions for forgery are multiplicitous. As noted above, Coleman was convicted under K.S.A. 21-3710(a)(2) for transferring a fraudulent check and was convicted under K.S.A. 21-3710(a)(3) for possessing the same check with the intent to transfer it. Although Coleman did not raise a multiplicity argument before the district court, appellate courts have addressed such an issue for the first time on appeal in order to serve the ends of justice and prevent the denial of a fundamental right. See, *e.g.*, *State v. Colston*, 290 Kan. 952, 971, 235 P.3d 1234 (2010). Coleman's multiplicity argument raises a question of law over which this court exercises unlimited review. See *State v. Conway*, 284 Kan. 37, 54, 159 P.3d 917 (2007).

Multiplicity is the charging of a single offense in several counts of a complaint or information. *State v. Scott*, 286 Kan. 54, Syl. ¶ 4, 183 P.3d 801 (2008). The principal danger of multiplicity is that it creates the potential for multiple punishments for a single offense, which is prohibited by the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. *State v. Fisher*, 283 Kan. 272, 312, 154 P.3d 455 (2007).

In *State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006), our Supreme Court announced an analytical framework for determining whether multiple convictions subject a defendant to double jeopardy. The overarching inquiry in this analysis is whether the convictions are for the same offense. This inquiry is broken into two prongs, both of which must be satisfied before a double jeopardy violation can be declared. First, do the convictions arise from the same conduct, and second, if the convictions do arise from the same conduct, are there two offenses or only one by statutory definition? 281 Kan. at 496.

### A. *Do the convictions arise from the same conduct?*

Our Supreme Court in *Schoonover* set forth some factors to consider in determining whether the conduct is the same or unitary under the first prong of the double jeopardy analysis: (1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct. If the convictions do not arise from the same conduct, then the analysis ends. 281 Kan. at 496-97.

Applying the *Schoonover* factors to the facts in this case, we find Coleman's acts of possessing the forged check—and then transferring the check to a Dillon's employee so it could be cashed—arose from the same criminal conduct. The acts occurred at the same time and in the same location. Coleman walked into Dillon's possessing the check and shortly thereafter handed the check over to the Dillon's employee to be cashed. No identifiable intervening event occurred between these two acts. Nor is there an identifiable fresh impulse between the two acts—Coleman walked into Dillon's for the purpose of cashing the check he possessed. The same impulse that caused Coleman to possess the check also caused him to attempt to cash the check at Dillon's. *Cf. State v. Wilson*, No. 97,451, 2008 WL 2422840, at *1 (Kan. App. 2008) (unpublished opinion) (holding that defendant's two convictions for forgery—based on making a forged check and then delivering that same check to a bank to be cashed—were not multiplicitous because the acts occurred on two different days, at two different locations, and the decision to take the check to the bank to cash it was motivated by "a fresh criminal impulse beyond the initial manufacture of the check"), *rev. denied* 287 Kan. 769 (2009).

Because the facts presented at trial showed that Coleman's possession of the check and his later delivery of the check to Dillon's occurred during the same course of conduct, we proceed to the second prong of the double jeopardy analysis.

*B.   Are there two offenses or only one by statutory definition?*

To determine whether the applicable statutory provisions provide for two offenses or only one, the test to be applied depends on whether the convictions arise from multiple statutes or from a single statute. *Schoonover*, 281 Kan. at 497-98. When, as here, the convictions arise from the same statute, a court applies the "unit of prosecution" test. 281 Kan. at 471-72. Under this test, the court looks at the language of the statute to determine whether the legislature intended the unitary conduct at issue to "constitute 'only one violation of the statute or to satisfy the definition of the statute several times over.' [Citation omitted.]" *State v. Thompson*, 287 Kan. 238, 246, 200 P.3d 22 (2009). If the language fails to clearly and unambiguously show that multiple convictions for unitary conduct are allowed for under the statute, the rule of lenity is applied and only one conviction will stand. *Schoonover*, 281 Kan. at 472.

Upon review of the statute at issue here, we find no language—let alone clear and unambiguous language—from which to conclude that the legislature intended to permit multiple forgery convictions based on the exact same criminal conduct. In the absence of such language, we must apply the rule of lenity and permit only one conviction to stand. See *Schoonover*, 281 Kan. at 472.

When convictions are multiplicitous, "a defendant should be sentenced only on the more severe offense." *State v. Gomez*, 36 Kan. App. 2d 664, 673, 143 P.3d 92 (2006). In this case, Coleman's conviction under K.S.A. 21-3710(a)(3) served as the primary crime for establishing his base sentence of 21 months' imprisonment. Therefore, Coleman's conviction under K.S.A. 21-3710(a)(2) must be reversed. Because Coleman received concurrent sentences for these two convictions, however, there is no need for him to be resentenced.

Affirmed in part, reversed in part, and remanded with directions.

\* \* \*

McANANY, J., concurring in part and dissenting in part: I agree with the majority's analysis on the multiplicity issue. Coleman's possessing the fraudulent check and then transferring it to another

were not separate crimes for which he could be convicted and punished twice. But I disagree with the majority's analysis of the alternative means issue and the holding in *State v. Foster*, 46 Kan. App. 2d 233, 264 P.3d 116 (2011), *rev. granted* 293 Kan. 1109 (2012), upon which it relies.

I agree with the *Foster* analysis with respect to the "issuing or delivering" of a negotiable instrument. These are not alternative means by which an instrument is transferred. In fact, K.S.A. 84-3-105(a) defines the issuance of an instrument as the "first delivery of an instrument." Nevertheless, I disagree with the majority's contention that "making, altering, or endorsing" are all related to the creation of an instrument.

A negotiable instrument, also referred to in the Uniform Commercial Code as simply an instrument, is an unconditional promise or order to pay a fixed amount of money that is payable to bearer or to order when issued and is payable on demand or at a definite time. K.S.A. 2011 Supp. 84-3-104(a). Creating a document with these features is how a negotiable instrument is made. The creation of such a document has nothing to do with its subsequent endorsement.

Under K.S.A. 84-3-105(a), an instrument is issued when there is the initial delivery of the instrument by its maker or drawer. "Drawer" means a person who signs or is identified in the draft as the person ordering payment. K.S.A. 2011 Supp. 84-3-103(3). Endorsement is not part of the issuance of an instrument.

Under K.S.A. 84-3-201(a), negotiation of an instrument means a transfer of possession by a person *other than the issuer*. Negotiation requires the holder to transfer possession and endorse the instrument. Thus, it is clear that the maker of an instrument does not negotiate it, but a later holder does so after the instrument has been created and issued. As the Official UCC Comment 1 to K.S.A. 84-3-201 notes: " 'Negotiation' is the term used in Article 3 to describe this post-issuance event."

Under K.S.A. 84-3-204(a), an endorsement is a signature *other than that of a signer as maker*, made on the instrument for the purpose of negotiating it. Thus, an endorsement is the signature of a later holder of the instrument, not its maker.

If an instrument is transferred for value and there is no endorsement of the instrument in order to make the transferee a holder, under K.S.A. 84-3-203 the transferee has the right to require the transferor to endorse the instrument. But in any event, transfer does not occur until the endorsement is made. Thus, an endorsement is a necessary element to effect the transfer of an instrument that has already been created. Endorsing an instrument is not part of creating or issuing an instrument.

Finally, K.S.A. 84-3-405 deals with an employer's responsibility for a fraudulent endorsement by an employee. Under this provision, when an instrument is payable to an employer, it is fraudulently endorsed when it contains a forged endorsement purporting to be that of the employer. When the instrument has been issued by the employer, it is fraudulently endorsed when it contains a forged endorsement purporting to be that of the payee of the instrument. Again, endorsement relates to the disposition of an instrument after it has been made and issued. It does not relate to the making and issuing of the instrument in the first instance.

With respect to the alteration of an instrument, K.S.A. 84-3-407(a) defines "alteration" as an unauthorized change in an instrument or an unauthorized addition of words or numbers or other changes to an incomplete instrument. An alteration also appears to relate to conduct after an instrument has been made and issued.

My examination of the statutory scheme tells me that the legislature has drawn a clear distinction between the making of an instrument, any subsequent alteration of the instrument, and its later endorsement when the instrument is transferred after issuance. This is consistent with what I perceive to be the universal practice in the banking and business communities. The majority relies on *Foster* for the proposition that making, altering, and endorsing an instrument are part of the creation of an instrument. I disagree. I would hold that to avoid the adverse consequences of the alternative means doctrine, the State was required to show that there was substantial evidence presented at trial that Coleman performed each separate act of making, altering, and endorsing the instrument.